561 So.2d 629 (1990)
Zonald Watson WEATHERFORD, Appellant,
v.
STATE of Florida, Appellee.
No. 88-2897.
District Court of Appeal of Florida, First District.
May 7, 1990.
Rehearing Denied June 7, 1990.
*630 Michael E. Allen, Public Defender, and Kathleen Stover, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Bradley R. Bischoff, Asst. Atty. Gen., Tallahassee, for appellee.
ZEHMER, Judge.
Zonald Weatherford appeals his conviction, pursuant to a jury verdict, for committing a lewd act upon a child in violation of section 800.04, Florida Statutes. Weatherford argues on appeal that the trial court erred in admitting hearsay evidence, allowing an expert witness to vouch for the child's credibility, and permitting improper impeachment of a defense witness. Finding error on all three points, we reverse and remand for a new trial.
The state charged Weatherford with sexual battery of T.J. by penetrating her vagina with his finger and by penetrating her anus with his finger, in violation of section 794.011, Florida Statutes. The case proceeded to trial at which the following occurred.
The state's first witness was Charlotte Chadik. She testified that she was a member of the Child Protection Team, an affiliate of the Department of Pediatrics at the University of Florida. (R. 38). The court qualified Ms. Chadik as an expert "in the field of investigating and interviewing children" with regard to alleged sexual abuse. (R. 27). Upon objection by the defendant, the state proffered her testimony as follows: Ms. Chadik interviewed T.J. pursuant to a referral from the Department of Health and Rehabilitative Services (R. 27); T.J. told her that she stopped going to her babysitter because of Weatherford and that Weatherford was a bad man (R. 29); T.J. proceeded to tell her "[he] touched me on my privates" and pointed to her breasts and vaginal area when she made that statement (R. 29); T.J. indicated that at the time of the occurrence she was with her babysitter at Weatherford's house and had gone into the bathroom (R. 29); when T.J. got off the toilet, Weatherford was in the bathroom with her and he touched her on her breasts and put his finger inside her vagina (R. 30); T.J. indicated that the touching hurt her (R. 30); T.J. stated Weatherford asked her if she would "touch him down here," pointing to the penis on a male doll, but she did not touch him (R. 30). When Chadik was asked if she did anything to *631 determine whether T.J.'s report to her was reliable, Chadik stated that she had done a number of things to determine reliability, and explained that: T.J. reported the incident in her own words, not adult language; T.J. didn't know the names of some body parts and indicated those parts on dolls; T.J. did not change her story, even when Chadik challenged it or tried to confuse her; and Chadik was satisfied that T.J. passed these reliability tests. (R. 30-32). At the conclusion of the proffer, defense counsel objected to Chadik's testimony of T.J.'s statements on hearsay grounds. (R. 37). The court overruled defense counsel's objections and allowed Chadik to testify. (R. 37). Chadik's testimony before the jury was essentially identical to that proffered. (R. 41-45).
The state next presented T.J. as a witness. (R. 52). T.J. testified that she was six years old and in the first grade (R. 55); she went to Weatherford's house for a barbecue and while she was there she had to go to the bathroom; Weatherford showed her where the bathroom was and he went inside with her (R. 58); after she went to the bathroom Weatherford touched her on her "private parts," indicating on a doll the places where Weatherford touched her (R. 59-61); when Weatherford touched her it hurt, and he touched her with his fingers (R. 61); Weatherford's finger did not go inside of her and he did not touch her on the "behind" (R. 62-63); after Weatherford touched her he left (R. 62); when she left the bathroom she told her babysitter what had happened, and she told her mother at a later time. (R. 67-69). When asked whether Weatherford told her not to tell anyone that he had touched her, T.J. replied "No." (R. 63). When asked if she saw the man that touched her in the courtroom, T.J. said "No," and when the prosecutor pointed to Weatherford and asked if that was "Zeke" (the name by which T.J. referred to Weatherford), she shook her head negatively. (R. 64).
The state next presented a proffer of the testimony of T.J.'s mother. (R. 71). The mother testified that: T.J. told her about the incident a couple of weeks after it happened (R. 73); T.J. had not wanted to go to her babysitter's house during that period (R. 73); T.J. told her that she was at "Zeke's" house for a barbecue, that she had to go to the bathroom, and that Weatherford showed her to the bathroom and went inside with her (R. 74); T.J. said that while she was in the bathroom Weatherford touched her "in her private parts" and indicated, by pointing, that he had touched her between her legs and stuck his finger inside of her (R. 74-76); and T.J. said that the touching had hurt her and that she had not told her babysitter (R. 76). Defense counsel objected to the mother's testifying as to what T.J. had told her on the ground it was hearsay and lacked trustworthiness (R. 76). The court overruled the objection, and allowed her to testify. (R. 78). Her testimony before the jury was essentially identical to that proffered. (R. 79-89).
Michelle Govin, T.J.'s babysitter, next testified for the state. (R. 89). Ms. Govin stated that: she, her fiance, her two children, T.J., and T.J.'s little brother, were at a barbecue when the incident happened (R. 91-92); T.J. asked to go to the bathroom and Weatherford said he would show her to the bathroom (R. 92); she saw Weatherford take T.J. back toward the bathroom, and he had his hand on her shoulder showing her the way; she did not see whether he went into the bathroom with her (R. 93, 99-100); T.J. was very upset when she returned from the bathroom and asked to go home (R. 94); she took T.J. to her own house because T.J.'s mother was still at work and she fed T.J. dinner (R. 94); T.J. acted very withdrawn and after she ate dinner, she became sick and vomited "all over everything" (R. 94); when she undressed T.J. that evening to give her a bath, she saw a dark brown stain in the crotch of T.J.'s underwear, and at the time, she thought some of the vomit had stained T.J.'s underwear. (R. 95). On cross-examination, Michelle testified that she became concerned that Weatherford may have harmed T.J. when Amy Weatherford, Weatherford's daughter-in-law, became angry with Weatherford and expressed things to her about Weatherford's past. (R. 97, 102, 115-116). She went on to state that it was not until *632 Amy expressed those things to her that she talked to T.J.'s mother. (R. 102).
Virgil Hart, Govin's fiance, testified that he was at the barbecue and heard T.J. ask to go to the bathroom. (R. 117). He stated that: he heard Weatherford volunteer to take T.J., but that he did not actually see Weatherford go into the bathroom (R. 117); T.J. walked up to Govin after returning from the bathroom and made it clear that she wanted to go home (R. 118); they returned to Govin's apartment, and T.J. vomited after eating a small amount of dinner (R. 118-119); she got some of the vomit on herself, and Govin cleaned her up (R. 119); later that evening, while Govin was cleaning T.J.'s underwear, he examined the underwear and saw what appeared to be dried blood in the lower back part of the crotch. (R. 120).
The state next proffered the testimony of Ethel McCormick, a Protective Investigator for H.R.S. Children Services. Ms. McCormick stated that she interviewed T.J. upon receiving the child abuse report, and that T.J. stated: while she was at Weatherford's house for a barbecue she needed to go to the bathroom (R. 130); Weatherford showed her the way to the bathroom and entered the room with her, and he remained in the room while she used the potty (R. 131); when she got off of the toilet, she thought that Weatherford was going to help her pull her panties back up but that he put his hands between her legs and played with her instead (R. 131). She stated that she asked T.J. whether Weatherford had put his fingers inside of her, and that T.J. was not sure. (R. 131). Ms. McCormick further testified that T.J. said she did not want to go back to Weatherford's house because she was afraid he would hurt her, and that she said, "He said if I told, that he would hurt me." (R. 132). After the proffer examination, defense counsel objected to McCormick's testimony on hearsay grounds; the court overruled the objections and allowed McCormick to testify. (R. 134-135). Ms. McCormick's testimony before the jury was essentially the same as her testimony during the proffer examination. (R. 135-139).
Dr. Mark Brown, a pediatrician, testified as an expert in the field of pediatrics and the medical examination of sexually abused children. (R. 155). He stated that T.J. was referred to him by the Child Protection Team and that he examined her to determine whether there was medical evidence of sexual abuse. (R. 155). He stated that his examination revealed that T.J.'s vaginal opening was approximately three times the normal size, and that in his opinion there had been some type of vaginal penetration. (R. 156-157). He further stated that T.J. described an incident to him where a person inserted a finger into her vagina and wiggled it around and also inserted a finger into her rectal area. (R. 157). After Dr. Brown's testimony, the state rested.
Defense counsel moved for a judgment of acquittal. The court granted the motion as to count II, penetration of the anus, but denied the motion as to count I. The defendant then called his witnesses.
Nancy Hedspeth, Weatherford's girlfriend, testified that she was at Weatherford's house the day of the incident, and was standing at the stove cooking when T.J. said she had to go to the bathroom (R. 178-179); her 11-year-old daughter, Mary, took T.J. to the bathroom and Weatherford stayed in the kitchen (R. 180); she left at one point to change her clothes, but Weatherford followed right behind her. (R. 180).
Mary Hedspeth, Nancy's 11-year-old daughter, testified that she was in the kitchen when T.J. asked to go to the bathroom, and Weatherford asked her to take T.J. to the bathroom (RII. 7); she took T.J. to the bathroom, closed the door, and waited outside the bathroom door until T.J. was finished (RII. 8); and after T.J. finished they went outside to play. (RII. 5-9).
Ester Hedspeth, Mary's 12-year-old sister, testified that she was also in the kitchen when T.J. asked to go to the bathroom, and that she saw her sister take her. (RII. 14-17).
Eugene Weatherford, appellant Weatherford's 26-year-old son, testified that he was on the back porch barbecuing on the date in question and that the bathroom was off of the back porch. (RII. 29). He did *633 not remember seeing his father take a child to the bathroom. (RII. 28).
Weatherford testified in his own defense that he remembered T.J. asking Govin if she could use the bathroom and stated that he told his stepdaughter Mary to take her. (RII. 38). He and Nancy walked out the front door at about that time. (RII. 38). His daughter-in-law Amy was angry with him regarding a custody fight over her daughter. (RII. 40).
At the conclusion of the trial, the court denied the renewed motion for judgment of acquittal. The jury found Weatherford guilty of the lesser-included offense of committing a lewd act upon a child and the trial court entered judgment on the verdict.
Appellant first argues that the trial court erred in admitting the testimony of Ms. Chadik, the mother, and investigator McCormick concerning T.J.'s out-of-court statements, because these statements constituted hearsay and the procedural safeguards of section 90.803(23), Florida Statutes (1987), the hearsay exception for child victims of sexual abuse, were not met. Section 90.803(23)(c), requires the court to make specific findings of fact on the record, setting forth the reasons the court determined the out-of-court statements to be reliable, and the reason it discounted any indications of a lack of reliability. Griffin v. State, 526 So.2d 752, 757 (Fla. 1st DCA 1988). In this case, the court did not comply with this requirement of the statute before admitting the testimony of any of these witnesses who testified to T.J.'s out-of-court statements. This was clear error. Fricke v. State, 561 So.2d 597 (Fla. 3d DCA 1990) (evidence of out-of-court statements by child abuse victim admitted pursuant to the recently created exception to the hearsay rule provided by section 90.803(23) violates the defendant's Sixth Amendment right of confrontation unless statutory requirements are strictly satisfied).
The state argues that any error on this point was harmless because substantially the same testimony was presented through T.J. and other witnesses. The record shows, however, that T.J. provided the only eyewitness account of Weatherford taking her into the bathroom. Furthermore, all of the statements that were attributed to T.J. were inconsistent with each other and with the testimony of T.J. in material respects. For example, while T.J. testified that Weatherford did not put his finger inside of her, Chadik and T.J.'s mother testified that T.J. told them Weatherford had put his finger inside of her and McCormick testified that T.J. indicated she was unsure whether Weatherford had put his finger inside of her. T.J. also testified that Weatherford did not warn her not to tell anyone what he had done, but McCormick testified that T.J. told her that Weatherford had threatened to hurt her if she told anyone. This child's credibility was a critical element in the proof of the charges against Weatherford, and the trial court's findings with regard to trustworthiness of these hearsay statements were essential. We cannot find the trial court's error in failing to make these findings on the record was harmless, and we reverse on this point. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. DeGuilio, 491 So.2d 1129 (Fla. 1986). To treat this inadmissible hearsay as merely cumulative would ignore the reality of the effect of repetitive assertions of a fact on the minds of jurors.
Weatherford next argues on appeal that the trial court also erred in allowing Ms. Chadik to testify that she used a number of techniques to determine whether T.J.'s statements to her were reliable and that she was satisfied that these statements were truthful.[1] We conclude that *634 the court erred in admitting this testimony. The law is well-settled that a witness's testimony offered to vouch for the credibility of another is inadmissible. See Tingle v. State, 536 So.2d 202 (Fla. 1988); Norris v. State, 525 So.2d 998 (Fla. 5th DCA 1988). It is most important to note that Ms. Chadik was not tendered as an expert in determining whether a child exhibited symptoms consistent with those of sexually abused children. Cf., Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988). On the contrary, she was tendered as an expert in the so-called field of "investigating and interviewing children involved in alleged sexual abuse." (R. 27). Her qualifications in this area were limited primarily to investigating incidents and interviewing children.[2] The techniques used by her (see note 1 supra) differed little from those employed by a skillful cross-examiner in the courtroom, where such techniques normally should be employed to permit the jury, rather than an expert witness, to decide the credibility issue for themselves.[3] In another sense, this expert on interviewing and determining the credibility of witnesses performed a test for credibility that, although different in substance, has the same purpose as an inadmissible lie detector test administered by a polygraph examiner. See Davis v. State, 520 So.2d 572 (Fla. 1988) (polygraph evidence is admissible only upon the oral or written stipulation of the parties). Nor can we treat this error as harmless. The testimony vouching for T.J.'s credibility was provided by an "expert" witness, and as the supreme court stated in Tingle v. State, "in cases such as this, `some expert testimony may be helpful, but putting an impressively qualified expert's stamp of truthfulness on a witness' story goes too far' [citation omitted]." 536 So.2d at 205. The trial court erred in admitting the testimony of Ms. Chadik and we reverse on this point.
Finally, Weatherford argues that the trial court erred in permitting the state to inquire of him why four of Ms. Hedspeth's children were not living with her. After an appropriate objection to the prosecutor's question was overruled, Weatherford responded that these children remained in North Carolina because that state had taken custody of the children from Ms. Hedspeth and her former husband. Obviously, the reason the children were not living with Hedspeth was a purely collateral matter and irrelevant to any issue being tried in this proceeding. The facts established by this testimony did not tend to impeach the credibility of the witness, and the state's brief admits this. Rather, the question and compelled answer served only the improper purpose of embarrassing and discrediting Ms. Hedspeth, *635 a defense witness, on a collateral matter. Ehrhardt, Florida Evidence § 608.1 (2d ed. 1984). We reject the state's sole argument in response, that defense counsel opened the door to these improper questions. The trial court erred in overruling defense counsel's objection to this inquiry. Cf. McLain v. State, 395 So.2d 1164 (Fla. 2d DCA 1981).
The dissent's characterization of our holding in this case as indulging "a fascination with trial technique and gamesmanship, at the expense of additional emotional and psychological trauma for the child victim" misses the point of this appeal. We are not insensitive to the fact that our ordering a retrial may have a serious emotional impact on the child victim. But that is not the applicable standard of review on appeal. Our function is to review the challenged action of the trial court below to determine whether it failed to comport with the applicable law and constitutional requirements so as to deprive the appellant of a fair trial, applying the harmless error test enunciated in the cited supreme court decisions. Required courtroom procedures and rules governing the admissibility of evidence are not simply courtroom techniques and are not appropriately characterized as courtroom gamesmanship. These procedures and evidentiary rules have been carefully developed over many decades to insure that the parties before the court are accorded due process of law and their fundamental constitutional rights. The trial court in this case departed from these requirements and deprived the appellant of a fair trial. Thus, having found error that is not harmless under the law, we have no choice but to reverse and order a new trial, notwithstanding compassion we feel for the child victim. If indeed the child victim will suffer significant "emotional and psychological trauma" or harm as a result of participating in a new trial, the statutory provisions governing courtroom procedure supply appropriate mechanisms to limit or avoid such harm to the child. See Fricke v. State, 561 So.2d 597.
The judgment is REVERSED and the cause is REMANDED for a new trial.
ERVIN, J., concurs.
WENTWORTH, J., dissents with opinion.
WENTWORTH, Judge, dissenting.
I would not reverse appellant's conviction for committing a lewd act upon a child. Appellant's commission of this offense was well established through both direct and circumstantial evidence presented by seven witnesses including the young victim, her mother, her babysitter, and several individuals with special expertise and training in investigating and caring for child abuse victims. The exculpatory testimony presented by appellant and his friends was properly considered by the jury, which found appellant guilty of only the lesser lewd act offense although there was sufficient evidence to convict on the greater charged offense of sexual battery. The majority now reverse even the lesser conviction based upon evidentiary points which produced no harmful error, thereby celebrating notions of courtroom gamesmanship which in this case have no significant impact upon any of appellant's substantial rights. This approach threatens our already overburdened legal system and does a disservice to both society at large and the participants in this case, including the child victim.
The majority's first point of error involves the lower court's failure to make sufficient record findings as to the reliability of the child victim's out-of-court statements made to her mother, a child protection team investigator, and an HRS investigator. The circumstances surrounding these statements were delineated upon proffer to the court outside the presence of the jury, in accordance with the predicate for admissibility under section 90.803(23)(a)1, Florida Statutes. Other statutory requirements for admissibility were also satisfied, and the court apparently concluded that the circumstances provided adequate safeguards of reliability so as to justify admission of the evidence. However, the court did not clearly articulate specific and express findings of fact, on the record, as to the basis for this ruling, as *636 required by section 90.803(23)(c), Florida Statutes. But this oversight does not warrant the reversal of appellant's ensuing conviction, as substantially the same evidence was presented through live testimony at trial. In this context the failure to fully comply with the mandated statutory procedure may be deemed harmless. See Cook v. State, 531 So.2d 1369 (Fla. 1st DCA 1988); Salter v. State, 500 So.2d 184 (Fla. 1st DCA 1986). As in Salter, in the present case the child victim testified at trial with regard to appellant's lewd act, and the challenged testimony as to the out-of-court statements was merely cumulative.
In determining that the lower court's failure to make sufficient record findings was not harmless, the majority state that the child victim "provided the only eyewitness account" and characterized her out-of-court statements as "inconsistent with each other and with the testimony" which she presented at trial. I am unable to agree with this conclusion, as it both distorts the record evidence and ignores the realities attending abuse and sex offenses perpetrated upon child victims. Such occurrences will seldom be witnessed by anyone other than the perpetrator and the victim. The present case involves corroborating evidence from the victim's babysitter and the babysitter's fiance, indicating that appellant volunteered to and did take the victim to the bathroom, and that afterward the victim was extremely upset and her undergarments were discovered to be stained with blood. The child herself testified as to the occurrences within the bathroom. This is more direct evidence than is available in a great many similar prosecutions, and provides a sufficient predicate for the jury's verdict. The out-of-court statements, which corroborated and further established the details of the offense, were thus merely cumulative. And the "inconsistencies" upon which the majority place great reliance are not of such magnitude as to warrant a contrary conclusion. Indeed, the truthful character of abuse reports containing minor inconsistencies was not only verified by the expert testimony at trial, but has also been recognized in numerous scientific studies. See e.g., D. Jones & M. McQuiston, Interviewing the Sexually Abused Child (Royal College of Psychiatrists 1988), cited with other studies in Meyers et al., Expert Testimony in Child Sexual Abuse Litigation, 68 Nebraska Law Review, Nos. 1 & 2 (1989). The only purported inconsistencies which the majority can identify relate to whether appellant penetrated the child victim in addition to touching her, and whether appellant threatened the child with harm should she reveal the incident. These are details of the kind which child victims may often have difficulty in repeating, particularly in a courtroom setting when visually and physically confronted by the defendant. The difficulties inherent in such intimidation have led many jurisdictions, including Florida, to approve alternative methods of securing such testimony. See e.g., section 90.803(23), Florida Statutes. The tension which this creates with regard to the defendant's rights of confrontation and cross-examination has been addressed in numerous decisions. See e.g., Craig v. State, 316 Md. 551, 560 A.2d 1120 (Ct.App. 1989), cert. granted ___ U.S. ___, 110 S.Ct. 834, 107 L.Ed.2d 830 (1990); Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In the present case this tension was avoided by subjecting the young child to the emotional and psychological pressures of the courtroom setting in which her testimony was presented. The jury could fairly assess any resulting inconsistencies in the testimony and statements, and not only did so but also afforded appellant the benefit of the doubt in rendering a guilty verdict only as to the lesser lewd act offense rather than the greater sexual battery charge.
The next point upon which the majority find error involves the child protection team investigator's testimony as to her techniques and methodology in receiving information from the child. This witness was qualified as an expert in "investigating and interviewing" child victims of alleged sexual abuse. The majority suggest that the witness' description of her techniques somehow deprived the jury of its function *637 in assessing the credibility of the child's statements. While courts often reject expert testimony as to the "truthfulness" of a witness, a limited exception to this rule is sometimes applied in the context of child sex abuse. See State v. Busch, 515 So.2d 605 (La. Ct. App. 1988); State v. Geyman, 224 Mont. 194, 729 P.2d 475 (1986); compare State v. Kim, 64 Haw. 598, 645 P.2d 1330 (1982), with In the Interest of Doe, 761 P.2d 299 (Haw. 1988), and State v. Castro, 69 Haw. 633, 756 P.2d 1033 (1988); see also, State v. Myers, 359 N.W.2d 604 (Minn. 1984). As a predicate for this limited exception the cited cases generally recognize the special difficulties presented by instances of child sex abuse, including the jury's usual lack of any common experience which would supply a foundation for assessing credibility in such circumstances. The cases further note that the jury's function is not impeded by expert testimony which provides assistance in this regard, as long as the jury is properly instructed as to its fact-finding authority.
I would not find that the challenged testimony in the present case establishes grounds for reversal of appellant's conviction. While this contention is pursued vigorously on appeal, appellant made no objection on this basis at trial. As indicated in State v. Myers, supra, the issue is not of such magnitude as to constitute fundamental error, and the failure to object below or otherwise preserve the issue for appeal should preclude our consideration of the matter.
And even upon the merits, the expert's testimony as to her investigative techniques cannot fairly be equated with a polygraph test as the majority suggest. The witness largely described accepted investigative and interviewing methodology, which was within the range of her qualified expertise. The majority acknowledge the validity of these techniques in describing them as akin to "those employed by a skillful cross-examiner in the courtroom... ." Whether such techniques are used by a child protection team member and accordingly described to the jury, or used by the "skillful cross-examiner" at trial, in either event the ultimate credibility determination remains with the jury. The challenged testimony in the present case does not encompass the conclusory "stamp of truthfulness" which is condemned in cases such as Tingle v. State, 536 So.2d 202 (Fla. 1988). Although the witness did express a belief that during her interview the child was "telling the truth" and gave a "truthful report," these statements were made in the broader context of a particularized description of the witness' application of the investigative and interviewing methodology. This is a matter uniquely within the witness' area of expertise, and was adequately explained so as to provide a basis for the jury's independent evaluation. Furthermore, even were the issue properly presented on the merits and were it determined that the testimony did tend to invade prohibited parameters, in the circumstances of this case I would find any error in this regard to be harmless. The majority's negation of child protection team techniques, and preference for skillful cross-examination, displays a lack of regard for the enormous legal and social difficulties produced by instances of sexual abuse of children, and an unwarranted preference in favor of courtroom form over substance.
The majority's final point merits little discussion, as it is not even characterized as harmful or reversible error in the majority opinion. The inquiry by the state as to why all of appellant's girlfriend's children are not living with her is a collateral matter which is largely irrelevant to the issues tried below. However, this matter was initially probed by appellant's counsel who made inquiry as to the number of these children and whether appellant acted as a "father" to them. The thrust of this inquiry was to depict appellant's role in this familial setting. Appellant's counsel thus may well have opened the door to additional inquiry which further revealed a more accurate familial depiction. And even had counsel not opened the door, given the minor collateral effect of this inquiry and the overwhelming evidence of appellant's guilt, any error in this regard should be deemed harmless.
*638 In summation, I would find that appellant has not presented any point of reversible error for our review, and I do not join the majority in reversing this conviction merely to indulge a fascination with trial technique and gamesmanship, at the expense of additional emotional and psychological trauma for the child victim. The courtroom procedures and evidentiary rules which the majority extol do not substantially impact the truth-finding process in this case, and thus do not affect appellant's right to a fair trial. In this context the blind adherence to a formalistic and insular process does not further the administration of justice. It is worth noting that during the cultural milieu of the late 19th and early 20th centuries, as jurisprudential theory evolved with significant legal protections for adult society,
... [c]hildren clearly remained at the mercy of adults. This was especially evident in the Victorian idealization of and lust for young female children. Called `the cult of the little girl,' the phenomenon resulted in unprecedented sexual abuse of children. .. . [A]n English medical journal ... notes that `in London alone ... [t]here were 6,000 brothels and 80,000 prostitutes, (many of whom were children).' .. .
... [T]echnological advances of the period encouraged the development of child pornography, which would become a major world industry by the latter twentieth century.
See On Trial  America's Courts and Their Treatment of Sexually Abused Children, Billie Wright Dziech & Judge Charles B. Schudson, Beacon Press (1989), at p. 49. In commenting on our contemporary jurisprudential response to children's issues, the authors state, at pp. 51-53, that:
Nowhere is discrimination against children more apparent than in the legal system's treatment of victims of sexual abuse... . Significant numbers of child molesters are never brought to trial because prosecutors know that ... adults often question children's credibility as witnesses... .
... We demonstrate peculiar logic where children are concerned... . We consider ours a `child-centered' society. And perhaps it is  until a child is pitted against an adult institution. Then somehow we forget children's separateness and uniqueness... .
If trials are genuine searchs for truth, that truth must be sought in light of society's modern understanding of children rather than in subservience to ageold biases and ignorance.
NOTES
[1] Ms. Chadik's testimony before the jury with regard to the reliability of T.J.'s statements was as follows:

Whenever I meet with a child in order to do an investigative interview, there are a number of things I want to check out about this child's report. One is, what I have already mentioned, how much of it is in the child's own language. I felt real satisfied, very satisfied that what [T.J.] was saying to me was in her own language.
Another thing that I will do is I will question the child and give them confusing information about what they have told me, and in some way try to challenge them. Will they change their story. So I might say to [T.J.], you mean this happened in the kitchen? and [T.J.] would say, no. This was the bathroom. So she would always clarify, come back to the original allegation. That helps me to believe in her ability to be consistent in her story. Thereby suggesting to me that she was telling the truth.
I also talked with [T.J.] about the distinction between fact and fantasy. Did she understand the difference between that. And did she understand the difference between the truth and a lie. And again, I went over that with [T.J.], as I do with all the children that I interview, and felt very satisfied that she was able to distinguish between the difference and she was giving me a truthful report.
(R. 44) (emphasis added).
[2] Ms. Chadik testified to the following educational qualifications:

A. I have a Bachelor's Degree in education. I have a Masters and Educational Specialist Degree in counselor education, and I have completed all my course work for my Ph.D. in counselor education. I lack my dissertation.
* * * * * *
A... . I received particular training on how to deal with investigative interviewing regarding child sexual abuse. Also training involved with violence in families, abuse in families, and how to intervene in those situations and to investigate them.
[3] There are, of course, exceptions to this usual practice in respect to child witnesses where the court makes a finding pursuant to section 90.803(23), Florida Statutes, that such interrogation should take place outside the courtroom because it has been shown that the child will suffer harm if compelled to testify in court. See Fricke v. State, 561 So.2d 597. But even then, the same techniques of questioning the child can be used by the examiner to establish or attack the child's credibility as a witness.