WALLACE, Judge.
A jury found Robert Geissler guilty of three counts of capital sexual battery[1] and one count of lewd or lascivious molestation.[2] On appeal from his judgment and sentences, Mr. Geissler raises five issues; two have merit. We agree with Mr. Geis-sler that the trial court erred in allowing the State to comment on his exercise of the right to remain silent and in allowing the State’s expert witness to vouch for the credibility of the child victim. For these reasons, we reverse the judgment and sentences and remand for a new trial.
I. THE FACTS
Mr. Geissler was fifty-six years old at the time of the trial. During the events pertinent to this case, he was married to Vicki Geissler. The Geisslers lived together in a two-bedroom home in Pasco County-
*943 The victim of Mr. Geissler’s alleged crimes is M.D., who is not related to either Mr. or Mrs. Geissler. However, Mrs. Geissler had known M.D.’s father, S.D., for many years. Initially, M.D. lived with S.D. in West Virginia. Under circumstances that are not explained in our record, the parental rights of M.D.’s parents were apparently terminated in 2005. As a result, M.D. came to Florida to live with Mr. and Mrs. Geissler in December 2005. M.D. was then four years old.
At some point after M.D. began living with the Geisslers, S.D. travelled from West Virginia to Pasco County. S.D. was apparently homeless, and he lived in a tent pitched in various locations. Mrs. Geissler occasionally took M.D. to visit S.D. at his tent. During one of these visits, Mrs. Geissler saw “a stack of magazines” with explicit sexual images in the tent.
From September 2007 until April 2008, Mr. Geissler was employed on a construction project in West Palm Beach. As a result, he was only at home on Saturdays and Sundays. Mrs. Geissler worked on Saturdays, and Mr. Geissler was left alone with M.D. on those days. During this period, M.D. was six years old and was attending the first grade.
On April 19, 2008, a Saturday, M.D. informed Mrs. Geissler about the sexual abuse allegedly perpetrated on her on that day and in the preceding months by Mr. Geissler.[3] An angry confrontation between Mr. and Mrs. Geissler ensued. Mrs. Geissler began packing to leave the house with M.D. At this point, Mr. Geissler went outside the house and shot himself in the chin with a pistol. He was taken to a hospital and ultimately recovered from the gunshot wound.
Mr. Geissler was arrested on July 14, 2008. The lead investigator assigned to the case was Detective Peter Federico of the Pasco County Sheriffs Department. Detective Federico went to the jail soon after Mr. Geissler was arrested in order to conduct an interview. Detective Federico informed Mr. Geissler of his Miranda[4] rights, and Mr. Geissler initially spoke with him. However, Mr. Geissler ultimately invoked his right to remain silent and requested an attorney. At that point, Detective Federico terminated the interrogation.
The State first brought Mr. Geissler to trial on the charges against him in October 2009. The first trial ended in a mistrial after Detective Federico testified before the jury that Mr. Geissler had terminated the postarrest interrogation at the jail by requesting an attorney and declining to say anything further. A second trial was held two months later in December 2009.
At the second trial, M.D. was eight years old. On direct examination by the prosecutor, M.D. described — in detail appropriate for her age — the acts allegedly perpetrated upon her by Mr. Geissler. However, on cross-examination by defense counsel, M.D. contradicted herself and testified that she had fabricated the allegations against Mr. Geissler because she was angry with him for disciplining her and because she wanted to be able to live with her father. On redirect examination, M.D. reversed course once again and testified that her testimony about the abuse had been truthful. The trial court disallowed defense counsel’s attempt to question M.D. further on re-cross-examination.
Mr. Geissler elected to testify in his own defense. He generally denied M.D.’s alle *944 gations that he had sexually abused her. He testified to the problems he had experienced in disciplining M.D. in Mrs. Geis-sler’s absence and M.D.’s resentment of him. Mr. Geissler asserted that any touching of M.D. that had occurred on April 19, 2008 — the date of M.D.’s report to Mrs. Geissler — was inadvertent. He claimed that he had shot himself accidentally, not because of any consciousness of guilt. Mr. Geissler admitted that he had been upset at the time, but he attributed his despondency to financial problems and the emotional devastation of watching his wife packing to leave him.
II. THE ISSUES
On appeal, Mr. Geissler raises five issues: (A) the prosecutor’s repeated comments and eliciting of evidence about Mr. Geissler’s postarrest exercise of his right to remain silent; (B) the admission of evidence that Mr. Geissler had shot himself shortly after Mrs. Geissler had confronted him with allegations of child sexual abuse; (C) the trial court’s determination that a licensed psychologist called by the defense as an expert witness did not qualify as an expert; (D) the admission of the testimony of the State’s expert witness vouching for the truth of M.D.’s testimony; and (E) the ruling prohibiting Mr. Geissler from eliciting testimony from M.D. that she knew that S.D. wanted her to live with him. We find reversible error in the first and the fourth issues raised by Mr. Geissler. Although we find no error in the remaining issues, we will discuss each of them briefly because they are likely to recur in a new trial.
III. DISCUSSION

A. Comment on the Exercise of the Right to Remain Silent

The first trial in this case ended in a mistrial after Detective Federico testified before the jury about Mr. Geissler’s post-arrest exercise of his right to remain silent and his request for a lawyer. The same judge presided over the second trial; the prosecutor and Mr. Geissler’s defense counsel also reprised their roles from the first trial. Despite the appearance of the same personnel at the second trial, comment on and testimony about Mr. Geis-sler’s postarrest exercise of his right to remain silent became a feature of the second trial. In fact, the matter was raised on four separate occasions during the one-day trial.
The first reference occurred during the prosecutor’s opening statement. Recounting Detective Federico’s jailhouse interview with Mr. Geissler, the prosecutor mentioned Mr. Geissler’s alleged failure to deny any of M.D.’s allegations as described to him by the detective. The prosecutor then told the jury: “What [Mr. Geissler] actually says is, I can’t say any more because if I do I’ll get in more trouble.” Defense counsel promptly objected to the prosecutor’s comment on Mr. Geissler’s exercise of his Fifth Amendment right to remain silent. Defense counsel also pointed out — to no avail — that such a reference “was the reason why the last trial got mistried, that statement.” As soon as the trial court overruled the objection, the prosecutor emphasized the impermissible reference by repeating it in a slightly altered version: “I don’t want to say any more because if I do, I may get in trouble. I’m not going to deny it.” Defense counsel moved for a mistrial, and the trial court denied the motion.
The second reference occurred during Detective Federico’s testimony. As soon as Detective Federico learned that Mr. Geissler had been arrested, he went to the Pasco County Detention Center to interrogate him. The interview was conducted around 9:30 or 10:00 in the evening. Al *945 though Detective Federico’s only purpose in going to the detention center was to interrogate Mr. Geissler concerning M.D.’s allegations, he failed to bring his recording device to the interview. As a result, the interrogation was not recorded.
Detective Federico testified at the trial concerning his jailhouse interview with Mr. Geissler. The detective testified that after he recounted M.D.’s allegations concerning the sexual abuse, Mr. Geissler did not specifically deny them. After this testimony, the following exchange between the prosecutor and Detective Federico occurred:
Q. After he does not deny any of those things, do you tell him in an attempt to get him to talk to you more that there’s other things that you think occurred?
A. Yes, ma’am.
Q. And as a result of that question, does he say anything? Does he make any kind of facial gestures, movements, whatever?
A. At that time he went on to tell me that — he said he does not want to go any further; and if he said more, he would get in more trouble.
(Emphasis added.) Once again, defense counsel objected on the ground that the testimony was a reference to Mr. Geis-sler’s exercise of his right to remain silent and moved for a mistrial. As before, the trial court overruled the objection and denied the motion.
The third reference occurred during the prosecutor’s cross-examination of Mr. Geissler. The prosecutor reminded the jury that Mr. Geissler had exercised his Fifth Amendment right to remain silent with the following question: “And at some point after the detective kept asking you what else happened, you ultimately said that you didn’t want to say anything else because if you do you’re going to get in more trouble, correct?” Once again, defense counsel’s objection was overruled, and Mr. Geissler was forced to acknowledge before the jury that he had exercised his right to refuse to answer any more of Detective Federico’s questions.
The prosecutor returned to the issue a fourth time in the rebuttal portion of her closing statement. Adopting the first person to speak in Mr. Geissler’s voice, the prosecutor said: “I don’t want to go any further. If I say more, I’m going to get into more trouble.” The prosecutor concluded this portion of her rebuttal by telling the jury: “He’s right. If he said more, he probably would [end] up getting in more trouble.”[5]
Under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), “comment on an accused’s post-arrest silence is constitutional error.” State v. DiGuilio, 491 So.2d 1129, 1134 (Fla.1986). The Supreme Court of Florida recently addressed the problem of improper testimony and comments that undermine and violate an accused’s right to remain silent as follows:
Unlike some evidentiary errors, such as the admission of a cumulative or irrelevant photograph, a comment on the right to remain silent strikes at the heart of our criminal justice system. This Court has clearly stated that it is constitutional error to penalize an individual for exercising the Fifth Amendment privilege; therefore, the prosecution may not introduce during trial the fact that an individual has relied upon this protection in the face of accusation. See Simpson v. State, 418 So.2d 984, *946 984-85 (Fla.1982) (quoting Jones v. State, 200 So.2d 574, 576 (Fla. 3d DCA 1967)); see also DiGuilio, 491 So.2d at 1131. As we stated in DiGuilio:
It is clear that comments on silence are high risk errors because there is a substantial likelihood that meaningful comments will vitiate the right to a fair trial by influencing the jury verdict and that an appellate court, or even the trial court, is likely to find that the comment is harmful under Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ].
491 So.2d at 1136-37. Accordingly, commenting on the silence of an accused is not a viable strategy for obtaining convictions, and any comment—direct or indirect—by anyone at trial on this right is constitutional error that should be avoided. See DiGuilio, 491 So.2d at 1136, 1139.
Ventura v. State, 29 So.3d 1086, 1088-89 (Fla.2010) (alteration in original). “[Cjourts must prohibit all evidence or argument that is fairly susceptible of being interpreted by the jury as a comment on the right of silence.” State v. Smith, 573 So.2d 306, 317 (Fla.1990).
Here, the problem we address is not the result of a careless remark by a witness or an isolated prosecutorial comment which is susceptible of more than one interpretation. On the contrary, the prosecutor—through her own comments and the testimony she elicited—hammered the point home again and again throughout Mr. Geissler’s brief trial that he had exercised his right to remain silent during the jailhouse interview conducted by Detective Federico. The trial court consistently overruled defense counsel’s objections and denied his motions for mistrial on account of these comments and testimony. In making these rulings, the trial court erred. See Green v. State, 27 So.3d 731, 735-36 (Fla. 2d DCA 2010).

B. The Admissibility of Evidence that Mr. Geissler Had Shot Himself

We conclude that the trial court did not abuse its discretion in admitting evidence that Mr. Geissler shot himself immediately after being confronted with the claim that he had sexually abused M.D. Like flight, an attempt at suicide may be indicative of a desire to avoid prosecution and is a circumstance from which guilt may be inferred. Penalver v. State, 926 So.2d 1118, 1133-34 (Fla.2006); Walker v. State, 483 So.2d 791, 796 (Fla. 1st DCA 1986). The question of whether the shooting was accidental or an attempted suicide and the significance to be attached to the event are matters to be resolved by the jury. See Walker, 483 So.2d at 796.

C. The Exclusion of the Defense Psychologist

We agree with Mr. Geissler that the trial court improperly concluded that the licensed psychologist called as a witness by the defense did not qualify as an expert. However, we find no reversible error on this point because Mr. Geissler failed to demonstrate how the expert’s proposed testimony could properly be applied to the evidence in this case.

D. Vouching for the Credibility of the Child Victim

On April 23, 2008, Julie Nadkarni examined M.D. at the Child Protection Team (CPT) office in New Port Richey. Ms. Nadkarni is an advanced registered nurse practitioner and medical examiner with the CPT. She has a master’s degree in child health and has conducted thousands of examinations for child sexual abuse during her nine years with the CPT.
Ms. Nadkarni took a history from M.D. and then conducted a complete physical examination of the child. The physical examination—as Ms. Nadkarni had antici *947 pated — disclosed no physical findings supporting the allegation that sexual abuse had occurred. Nevertheless, over timely defense objection, the trial court permitted Ms. Nadkarni to testify as follows:
My impression was that the medical assessment supported the allegation of sexual abuse. The child gave a history of a sexual abuse; however, the physical findings neither supported nor negated an allegation of sexual abuse. Since many types of sexual abuse will leave [no] physical findings on an exam, that the exam shouldn’t be viewed as evidence that the sexual abuse did not take place. But it appears to be a case of sexual abuse without physical findings on the exam.
(Emphasis added.) Because the physical findings on examination of M.D. did not support the allegation of sexual abuse, Ms. Nadkarni’s “impression ... that the medical assessment supported the allegation of sexual abuse” can only have been based on the history of sexual abuse reported by the child. Accordingly, Mr. Geissler argues that Ms. Nadkarni’s testimony impermissi-bly conveyed to the jury her conviction that M.D. was telling the truth about the alleged sexual abuse. We agree.
As a general rule, “it is not proper to allow an expert to vouch for the truthfulness or credibility of a witness.” Frances v. State, 970 So.2d 806, 814 (Fla. 2007) (citing Feller v. State, 687 So.2d 911, 915 (Fla.1994), and State v. Townsend, 685 So.2d 949, 958 (Fla.1994)). The general rule applies to prohibit an expert witness from testifying concerning the truthfulness or credibility of the victim in child sexual abuse cases. Tingle v. State, 536 So.2d 202, 205 (Fla.1988); Weatherford v. State, 561 So.2d 629, 634 (Fla. 1st DCA 1990). Of course, a nurse practitioner such as Ms. Nadkarni may testify to the physical findings observed on examination of a child victim. See State v. Gerry, 855 So.2d 157, 160 (Fla. 5th DCA 2003). It is also proper for such a nurse practitioner to explain why, given the nature of the abuse alleged, physical injury may not be observed on examination. Id.
Even if the expert does not comment directly on the child victim’s credibility, expert testimony is improper if the juxtaposition of the questions propounded to the expert gives the jury the clear impression that the expert believed that the child victim was telling the truth. Hitchcock v. State, 636 So.2d 572, 575 (Fla. 4th DCA 1994); Price v. State, 627 So.2d 64, 66 (Fla. 5th DCA 1993). Here, Ms. Nad-karni did not opine directly on M.D.’s credibility. Nevertheless, Ms. Nadkarni’s testimony concerning her “medical assessment” that sexual abuse had occurred was based entirely on the history of sexual abuse reported by the child. This testimony left the jury with the unmistakable impression that Ms. Nadkarni’s opinion— supported as it was by her impressive credentials — was that M.D.’s account of the sexual abuse was truthful. The admission of this opinion testimony — especially in a case where the child has testified that she fabricated her story about the sexual abuse for an ulterior motive — was error. See Feller v. State, 637 So.2d 911, 915 (Fla.1994).

E. Excluding Testimony About the Child’s Knowledge of her Father’s Wishes

We find no error in the trial court’s ruling prohibiting Mr. Geissler from asking M.D. if she knew that S.D. wanted her to live with him. This question was objectionable because it called for M.D. to speculate concerning S.D.’s state of mind. See Branch v. State, 96 Fla. 307, 118 So. 13, 15 (1928) (“[T]he rule is well *948 established that a witness is not permitted to testify as to the undisclosed intention or motive of a third person.... ”). Moreover, Mr. Geissler was not prejudiced by this ruling because defense counsel successfully elicited an admission from M.D. that she had fabricated her allegations against Mr. Geissler because she wanted to live with her father. Thus the jury was aware that M.D. had a motive to lie about the alleged sexual abuse.
IV. HARMLESS ERROR ANALYSIS
The State asserts that both of the errors discussed above amount to harmless error. We disagree. M.D.’s testimony concerning the alleged abuse was contradictory and inconsistent. The physical examination of M.D. did not result in any findings indicative of sexual abuse. Moreover, the defense established that M.D. had a motive to fabricate her allegations. M.D.’s familiarity with sexual matters at an early age could be explained by her exposure to sexually explicit materials during her visits to S.D. Mr. Geissler denied any contact with M.D. of a sexual nature other than the contact on April 19, 2008, which Mr. Geissler claimed was accidental.
For these reasons, the question of Mr. Geissler’s guilt or innocence turned on a credibility contest between M.D. and Mr. Geissler. The State used Mr. Geissler’s exercise of his right to remain silent to challenge his credibility and to suggest that he was guilty of the alleged sexual abuse. On the other side of the ledger, Ms. Nadkarni’s testimony improperly bolstered M.D.’s credibility. Under these circumstances, the State has not met its burden of showing beyond a reasonable doubt that neither of these errors contributed to the verdicts. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).
V. CONCLUSION
For the foregoing reasons, we reverse Mr. Geissler’s judgment and sentences and remand for a new trial.
Reversed and remanded for a new trial.
NORTHCUTT and LaROSE, JJ., Concur.

. § 794.01 l(2)(a), Fla. Stat. (2006, 2007).

. § 800.04(5)(b), Fla. Stat. (2006, 2007).

. In the information, the State alleged that the crimes occurred between April 1, 2007, and April 30, 2008.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Defense counsel did not object to the prosecutor's final comments on Mr. Geissler’s exercise of his right-to remain silent.