NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

CORNELIUS DION BASKIN,   )
           )
   Appellant,    )
           )
v.          )   Case No. 2D14-3802
           )
STATE OF FLORIDA,    )
           )
   Appellee.    )
           )
_____)

Opinion filed March 7, 2018.

Appeal from the Circuit Court for
Manatee County; Charles E. Roberts,
Judge.

Mark Lipinski, Bradenton, and
Christopher E. Cosden, Fort Myers,
for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Bilal A. Faruqui,
Assistant Attorney General, Tampa,
for Appellee.

SALARIO, Judge.

   Cornelius Baskin appeals from his judgment and sentence for second-

degree murder.  The evidence at his trial included statements he made to police after he

was confined in the psychiatric wing of a hospital.  Although Mr. Baskin's family retained

a lawyer to represent him, the police did not tell him that and instead interviewed him in the absence of counsel. The admission of those statements violated the due process clause of the Florida Constitution. We reverse and remand for a new trial or other proceedings consistent with this opinion.

On June 7, 2012, Regina Nunez was found dead, lying face down on her bed in her apartment in Bradenton, Florida. She had last been seen alive by a friend during the afternoon of June 6. When police began investigating the death, they learned that Ms. Nunez and Mr. Baskin were romantically involved and that Mr. Baskin was frequently in her apartment. That led police to want to talk to him.

At the time, Mr. Baskin had been committed to Manatee Memorial Hospital pursuant to the Baker Act. See §§ 394.451-.4892, Fla. Stat. (2011). While at his parents' during the afternoon and evening of June 6, he had been behaving in an agitated way—nervous, pacing, and unable to relax or slow down. He had, according to his mother, suffered from similar mental health problems before. At about four o'clock in the morning on June 7, Mr. Baskin's parents took him to Manatee Memorial. He was placed in the psychiatric unit, which is secure and allows only limited visitor access.

When Mr. Baskin's mother came to visit him around six o'clock in the evening on June 7, a nurse told her that she would not be permitted to see him. The nurse explained that Ms. Nunez had been found dead, that the police were coming to the hospital to question Mr. Baskin, and thus that no visit could be allowed. Concerned about her son's being questioned in light of his mental state at the time, Mr. Baskin's mother set about looking for an attorney to represent him.

She reached out to Layon Robinson, a lawyer in Manatee County who was married to a friend of hers from church, who agreed to represent Mr. Baskin. Mr. Robinson immediately went to the hospital. He spoke to a security guard and a nurse at the psychiatric unit and told them that he was Mr. Baskin's lawyer, but he was not permitted to see Mr. Baskin. Mr. Robinson gave the nurse a business card, reiterated that he was Mr. Baskin's lawyer, and told them that he did not want Mr. Baskin talking to the police. He waited with Mr. Baskin's parents for a short while—Mr. Baskin's father having arrived at some point during the events—but the police did not arrive. They all then left the hospital with a plan to come back in the morning to talk to Mr. Baskin.

The police arrived sometime later. Although the record is not clear about the chain of communication, it is clear that they became aware that a lawyer had been hired to represent Mr. Baskin. Notwithstanding that, the investigating detective interviewed Mr. Baskin. That detective did not tell Mr. Baskin that he had a lawyer and did not inform him of any rights under Miranda v. Arizona, 384 U.S. 436 (1966). Mr. Baskin had also been given medications by the hospital to calm him down, and he was expected to become drowsy. During the interview, Mr. Baskin initially said that he had last seen Ms. Nunez a couple of days before the murder but then later stated that he had last seen her at her apartment around eight in the morning on June 6. He also said that when he left, Ms. Nunez was asleep in her bed. The detective asked about the last time Mr. Baskin and Ms. Nunez had had sex, and Mr. Baskin said about a week before.

The county medical examiner concluded that Ms. Nunez's death was a homicide and that the cause of death was asphyxiation. The State charged Mr. Baskin with second-degree murder. Prior to trial, Mr. Baskin moved to suppress the statements

- 3 -

he made to the police at Manatee Memorial on the ground, among others, that the police decision to conduct the interview without Mr. Baskin's counsel present and without informing Mr. Baskin that counsel had been retained for him violated the due process clause of article 1, section 9 of the Florida Constitution. The trial court denied the motion because it concluded that the interview was not a custodial interrogation.

The case went to trial. The State's DNA evidence put Mr. Baskin's DNA on Ms. Nunez's person and in her bedroom, but it also produced evidence of other contributors—including at least one other male contributor. Although the presence of Mr. Baskin's DNA was consistent with his being the murderer, it was also consistent with what one might expect of people in close contact, as the evidence showed Mr. Baskin and Ms. Nunez had been. The State proceeded on a theory that Mr. Baskin killed Ms. Nunez because he was jealous and believed she was carrying on with other men. There was evidence that Mr. Baskin had a tumultuous relationship with Ms. Nunez, with frequent loud arguments and accusations by Mr. Baskin that Ms. Nunez had been unfaithful. There were cell phone records reflecting several calls and emotional texts between Mr. Baskin and Ms. Nunez on the day of the murder that showed that the two planned to see each other that day. And the State presented site location data from Mr. Baskin's cell phone carrier that showed that his cell phone connected to the cell tower closest to Ms. Nunez's home at a time consistent with the medical examiner's testimony concerning when the murder may have occurred.

During closing arguments, the State highlighted Mr. Baskin's statements to the police at the hospital that were admitted during trial, arguing that they placed him in the apartment close in time to the murder, showed a familiarity with the details of the

crime, and showed a consciousness of guilt. In its initial closing argument, the State argued that suggestions from evidence adduced by the defense that certain other persons might have committed the murder were meritless, stating as follows:

> If the killer is one of those people, how come we see no texts from that person, in those last several texts where we know Ms. Nunez to be alive. And that, ladies and gentlemen, the fact that he wants to put himself as far away from her apartment as he can, in the hours surrounding her death, is why he fudges his answers when he talks to [the detective] at the hospital. He first says that he last spoke to her a couple days ago. That's his first answer. Then he says he was at the apartment around 8 a.m. on the 6th, and that Regina was asleep on the bed when he left. And it's interesting that the last time he saw her, I submit some of the truth leaks through his statements, he says she's on the bed the last time he saw her. Because that is the last place he saw her, ladies and gentlemen, on the bed, lifeless.

(Emphasis added.)

The jury convicted Mr. Baskin, and the trial court sentenced him to thirty years in prison to be followed by ten years of probation. This is Mr. Baskin's timely appeal. He argues, among other things, that the trial court erred in admitting his statements to the police during his uncounseled interview at the hospital.

The supreme court's decision in State v. McAdams, 193 So. 3d 824 (Fla. 2016)—rendered after the trial in this case—compels us to reverse. There, the police interviewed an estranged husband during an investigation into the whereabouts of his wife and her boyfriend. Id. at 826. The husband was told that he was not under arrest and voluntarily accompanied a detective to the sheriff's office, where he was questioned in an interview room. Id. While he was being questioned, an attorney retained by the husband's parents arrived. Id. at 826-27. Although the lawyer told the deputy at the

counter that he wanted all questioning to stop, he was not allowed to communicate with his client. Id. at 827. The husband confessed to murdering his wife and her boyfriend. Id. at 826. After he confessed, the questioning detectives read the husband the Miranda warnings, and the husband continued talking and directed the detectives to the bodies of the wife and boyfriend. Id.

After the trial court denied a motion to suppress the husband's statements, he was convicted and sentenced to life in prison. Id. at 828. Our court reversed, holding that once the detectives read the husband the Miranda warnings, he was in custody and entitled to be informed about the attorney retained to represent him. Id. (citing McAdams v. State, 137 So. 2d 401, 407-08 (Fla. 2d DCA 2014)). We certified a question to the supreme court concerning whether and when a defendant who is not in custody has a right to be informed that a lawyer has been retained to represent him and wishes to talk to him. Id. at 828-29. The supreme court rephrased that question as asking when, under the due process clause of the Florida Constitution, a person being questioned by law enforcement in a nonpublic location must be notified that an attorney retained for that person is at the location and available to speak with him or her. Id. at 829.

The supreme court held that "when an individual is being questioned in a non-public area, and an attorney retained on his or her behalf arrives at the location, the Due Process Clause of the Florida Constitution requires that the police notify the individual of the attorney's presence and purpose." Id. at 832. This is true regardless of whether the defendant is in custody, the supreme court held, because it is "unworkable for the due process rights of an individual under the Florida Constitution to be

- 6 -

contingent upon custodial status with regard to access to a retained attorney" because "[i]t is clear that as soon as a retained attorney arrives at the law enforcement office, the questioning of the individual can intensify significantly with the goal of obtaining a confession." Id. at 831. Thus, "the only way to properly protect the due process rights of citizens under the Florida Constitution is to implement a bright-line rule" that when someone is being questioned in a nonpublic place and an attorney arrives to represent them, the individual under questioning is entitled to know. Id. at 832.

We see no material respect in which this case is distinguishable from McAdams. The supreme court explicitly rejected the custodial/noncustodial distinction upon which the trial court, consistent with our court's earlier decision in McAdams, relied in denying Mr. Baskin's suppression motion in favor of a "bright-line" rule that applies whenever a defendant is being questioned in a nonpublic place and an attorney comes to represent him.[1] There is no dispute that Mr. Baskin was questioned in a nonpublic place—Baker Acted in a secure unit in a hospital—or that an attorney had been retained to represent him. The only difference here is that the attorney left the hospital before the police arrived, whereas in McAdams the attorney was physically present at the sheriff's office while the interrogation was in process. That distinction makes no difference on the facts of this case. An attorney was retained for Mr. Baskin and wanted to talk to him, the police were aware of it before they questioned Mr. Baskin, and the attorney provided a business card to the nurse at the hospital so that there was a

---

[1]McAdams also addressed errors associated with the failure to give Miranda warnings in a custodial situation, 193 So. 3d at 830-45, an issue we need not discuss because we reverse based on McAdams' holding regarding the failure to inform Mr. Baskin that he had counsel.

means for the police to get Mr. Baskin in contact with him. Given those circumstances, there is no reason why the applicability of McAdams to this case would hinge on the fact that Mr. Baskin's lawyer happened not to be physically present at the hospital when the police arrived to question Mr. Baskin. See Greenwich v. State, 207 So. 3d 258, 264 (Fla. 5th DCA 2016) (holding that the fact that counsel was not physically present at the nonpublic facility where questioning was taking place was immaterial where counsel attempted to contact his client at the facility by telephone).

Nor was the admission of Mr. Baskin's statements to the police harmless beyond a reasonable doubt. See Geissler v. State, 90 So. 3d 941, 948 (Fla. 2d DCA 2012) (observing that State bears burden of establishing harmlessness beyond reasonable doubt). This was a close case. The DNA evidence was not conclusive, and the balance of the State's case as to identity and state of mind hinged on inferences drawn from circumstantial evidence, such as the character of Mr. Baskin's relationship with Ms. Nunez and the cell-site-location data placing Mr. Baskin's phone at a cell tower near Ms. Nunez's apartment close in time to the murder. The admission of Mr. Baskin's statements enabled the State to add to those circumstances in closing argument that Mr. Baskin was in Ms. Nunez's apartment close in time to the murder, that he was acquainted with the position of the body at the crime scene, and that after the murder, Mr. Baskin behaved in a manner consistent with the way a guilty person would behave when approached by the police—fudging answers about important details but admitting enough to show that he knew what happened because he was there. On this record, we are unable to say that there is no possibility that the error in admitting these statements contributed to the verdict. See Williams v. State, 199 So. 3d 424, 428 (Fla.

2d DCA 2016) (holding that erroneous admission of evidence of the defendant's flight was not harmless where the State's evidence was not overwhelming and stating that "because the evidence of flight established an inference of consciousness of guilt, we simply cannot say that . . . this evidence did not contribute to the verdict"); Allen v. State, 192 So. 3d 554, 558 (Fla. 4th DCA 2016) (holding that evidence of the defendant's prearrest refusal to submit to a DNA test was not harmless, even where he submitted to the test postarrest, because the evidence was "admitted to show his consciousness of guilt" and "the state emphasized this erroneously admitted evidence in its closing argument").

Mr. Baskin also argues that the trial court erred in denying his motion to suppress the cell-site-location data presented by the State on grounds that it was obtained without a warrant in violation of the Fourth Amendment to the United States Constitution.[2] In Tracey v. State, 152 So. 3d 504, 526 (Fla. 2014), our supreme court held that the warrantless procurement of real-time cell-site-location data violated the Fourth Amendment, but it did not address whether the same conclusion pertains to past or historical cell-site-location data of the type used in this case. The question of whether law enforcement may access a suspect's historical cell-site-location data without a warrant is before the United States Supreme Court in Carpenter v. United States, No. 16-402, with a decision expected this term. See Carpenter v. United States, 137 S. Ct. 2211 (2017). Mr. Baskin has filed a motion asking that we stay our decision

_____

[2]Mr. Baskin further challenges the denial of his motion for judgment of acquittal on grounds that the State failed to satisfy the special standard applicable in circumstantial evidence cases and that the trial court erred in admitting certain testimony by the custodian of Mr. Baskin's cell phone records. We find no merit in either issue and decline to address them further.

in this appeal pending the outcome of <u>Carpenter</u>. Because reversal is necessary regardless of how <u>Carpenter</u> is decided, we deny that motion by way of separate order. We note, however, that in the event this case is retried as a result of this opinion, any determination under the Fourth Amendment concerning the admissibility of the cell-tower data will likely be controlled by the decision in <u>Carpenter</u>.

For the foregoing reasons, the judgment and sentence of the trial court is reversed and this case is remanded for a new trial or other proceedings consistent with this opinion.

Reversed and remanded.

KELLY and BLACK, JJ., Concur.