KELLY, Judge. '
Michael McAdams was convicted of murdering his wife, Lynda McAdams, and her coworker and boyfriend, Ryan Andrews. He was sentenced to two consecutive life sentences. In this appeal of his judgment and sentences, Mr. McAdams challenges the trial court’s denial of a motion to suppress his confession and evidence obtained as a result of the confession. He also challenges the trial court’s denial of a motion to suppress evidence seized from his wife’s residence. We conclude that the trial court did not err in denying the motions to suppress Mr. McAdams’ confession and the evidence found in Lynda Mc-Adams’ home; however, we must reverse the judgment and sentences because the trial court erred in denying the motion to suppress certain evidence obtained after Mr. McAdams confessed.
Lynda McAdams and Ryan Andrews were reported missing by their families. During the course of the missing persons’ investigation, a detective searching for Lynda McAdams entered her Pasco County home, and based on his observations, detectives from major crimes became involved in the investigation. The detectives contacted Mr. McAdams at his parents’ home in Hernando County and obtained his written consent to search his wife’s residence. Although Mr. McAdams no longer lived at the Pasco County home, detectives presumably sought his consent because he still co-owned the home with Mrs. McAdams.
Mr. McAdams moved to suppress the evidence seized during the search of his wife’s residence. The trial court denied the motion finding that the initial entry was justified by exigent circumstances and that the subsequent search was done with Mr. McAdams’ consent. Because we find no error in either the trial court’s factual findings or in its application of the law, we affirm without further comment the denial of the motion to suppress the evidence seized from Mrs. McAdams’ residence.
After the search of Mrs. McAdams’ residence, Hernando County detectives visited Mr. McAdams at his home and asked him if he would be willing to meet with the Pasco County detectives who were investigating his wife’s disappearance. He agreed and accompanied them to the Her-nando County Sheriffs Office to meet with the detectives from Pasco County. The entire interview, which lasted approximately two and a half hours, was- videotaped. During this interview, Mr. Mc-Adams confessed to killing his wife and Mr. Andrews. At that point the detectives advised Mr. McAdams of his Miranda[1] rights, which he waived. He then led detectives to where he had buried the bodies of Mrs. McAdams and Mr. Andrews. He also showed them where he had left Mr. Andrews’ car, and he took them to where he had disposed of the gun he had used in the murders.
Unbeknownst to Mr. McAdams, while he was being interviewed an attorney hired by his parents had arrived at the sheriffs office.. The attorney asked that the interview be terminated and that he be allowed to speak with Mr. McAdams. The detectives conducting the interview declined both requests and continued with the interview without telling Mr. McAdams about the attorney. It was not until after Mr. McAdams had taken the detectives to the place where he had buried the bodies of his victims that the detectives told him about the attorney.
Mr. McAdams moved to suppress his confession as well as the evidence collected after he confessed. He argued that *404 throughout the time he was at the sheriffs office he had been in custody and that his confession was obtained in violation of Miranda. He also argued that the detectives’ refusal to advise him of his attorney’s presence and desire to speak with him violated the due process provisions of article 1, section 9 of the Florida Constitution. The trial court denied the motion after concluding that Mr. McAdams was not in custody at the time he confessed and that the detectives’ delay in advising him about the attorney was not misconduct that would amount to a due process violation.
Under Miranda, statements made to the police during a “custodial interrogation” must be suppressed if the police have not informed the suspect of his constitutional rights before the interrogation. State v. Pitts, 936 So.2d 1111, 1123 (Fla. 2d DCA 2006). As we explained in Pitts,
[i]n determining “whether a suspect is ‘in custody’ for purposes of receiving of Miranda protection, the ultimate inquiry is simply whether there is a ‘formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest.” Whether a suspect has been subjected to such a restraint on freedom of movement depends on “how a reasonable [person] in the suspect’s position would have understood his situation.”
Id. (second alteration in original) (citation omitted). “Miranda custody determinations present mixed questions of law and fact, under which the reviewing court defers to the competent factual determinations of the trial court but analyzes de novo the application of the law to those facts.” Rigterink v. State, 2 So.3d 221, 246 (Fla.2009), vacated on other grounds, 559 U.S. 965, 130 S.Ct. 1235, 176 L.Ed.2d 175 (2010). “In this context, precedent remains a persistent guide but often plays less of a role because each custody determination depends upon the highly unique facts of the given case.” Id.
The trial court’s order details the facts developed at the suppression hearing, and it analyzes those facts using the test adopted by the Florida Supreme Court in Ramirez v. State, 739 So.2d 568 (Fla.1999). In Ramirez, the court looked at four factors to determine
whether a reasonable person in the suspect’s position would consider himself in custody: (1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Id. at 574. As we noted in Pitts, “the four-factor test must be understood as simply pointing to components in the totality of circumstances surrounding an interrogation.” 936 So.2d at 1124; see also Rigter-ink, 2 So.3d at 246 (explaining that with respect to the objective reasonable person framework for analyzing custody, the test in Ramirez is a “subsidiary four-part channeling paradigm to organize and analyze the case-specific facts that are relevant to determining whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave”). Pitts explains:
No factor on the Ramirez list of factors can be considered in isolation. The whole context must be considered. A factor that would militate strongly toward the conclusion that a suspect was in custody in one context might be viewed differently in a materially different factual context. The focus of the inquiry must remain on whether a reasonable person in the suspect’s posi *405 tion — given all the relevant circumstances — -would have understood himself to be in custody.
936 So.2d at 1124. The trial court went through each of the Ramirez factors and made the following findings:
I did take multiple opportunities to go over a lot of the information provided to me prior to today’s hearing. I’ve already mentioned on the record that I did see the entire audio and video portion of the interview. I read the files, transcripts of depositions, and the motion and memoranda and opposition and the case law, everything that was provided to me by both sides. After hearing everybody’s testimony today, it was as clear to me at the end of the day as it was in the beginning that we’ve got a couple of major issues that both sides seem to focus in on, and that carried the day for the question of the day. Obviously, the first issue was whether or not the defendant was in custody in accordance with the guidelines set out in RAMIREZ. Which I am always happy to have guidance of any sort, it makes my job a lot easier, and thank you both sides for providing the case law that you did, and I read everything thoroughly. Guidance turns my decisions basically into a mathematical formula in some cases, which is very helpful to me.
In the RAMIREZ case there’s four prongs, as you all know, that help and guide a judge to decide whether or not someone was in custody. So in going through those prongs, let’s start with the first prong, “The manner in which police summoned the suspect for questioning.”
In this case, as we all heard and testimony bore out, Mr. McAdams was brought to the Hernando County Sheriffs Office via a marked deputy vehicle. For all intents and purposes, while obviously I’m sure we all read case law where there’s no — it’s clear that defendant was coming of his own free will in those instances where he drives, he or she drives himself in his own vehicle to the police station.
In this case, after testimony from the defendant and the transporting deputy and the detective, it appears that defendant willingly went and voluntarily went with the police, the deputy, in the transport vehicle, and was not concerned that — or there was no reason for him to believe, even by the reasonable person’s standard, that he was not free to decline that ride. There was — particularly under the circumstances where the underlying initial investigation involves a missing person who happened to be married to the defendant, so by his own statements in both the interview, the taped interview and today’s testimony he indicated he wanted to be helpful and go and be helpful in any manner he could.
So Prong One, I find, indicates that, according to Prong One of RAMIREZ, that according to that he was not in custody as to that prong. The next one, “Purpose, place and manner of the interrogation.” Obviously the interview took place at the Sheriffs Office. But again as I already said, he went there voluntarily. It was in a small interview room. But it was clear from the video that the defendant was seated closest to the door, there was nothing barring his exit, the door was not locked, according to testimony. And there were two detectives present in the room with him who were both seated further away from the door than the defendant and not blocking his way. There was nothing, from what I could see in the tape, there was no one obviously standing there blocking his way, nor was there any testimony as to that other than the defendant indicat *406 ed that at some point he did see two uniformed officers standing near the door. But Mr. Halkitis on cross elicited some testimony that he was not watching the door, which the videotape bears out his back was to the door. So, I find for all purposes that Prong Number Two indicates that defendant was not in custody.
The third prong is, “The extent to which the suspect is confronted with his guilt.” Now, this one there were clearly some issues raised, and I’m going to make a few finding as to that. The Defense went to considerable length and focused on showing that the Pasco detectives suspected the defendant, that the defendant killed his wife even before they began questioning him. And then on direct Detective Christensen, in her testimony, seemed to attempt to minimize her suspicions of defendant. And in this whole line of focus, everything seemed to me, that whole thing seemed somewhat incredible as to Detective Christensen’s — like I said, she seemed to minimize her suspicions.
A seasoned Major Crimes detective dealing with a missing person, and she already knows many, many things from her own observations, and now she’s sitting talking to the spouse of a missing woman, I find it very hard to believe that she did not consider Mr. McAdams a suspect. Because even lay people are subject to statistics that say, “Oh, 95 percent of homicides are all committed by someone you know.” And so again I find it very hard to believe that Detective Christensen didn’t have a pretty strong suspicion that Mr. McAdams was a suspect.
But I don’t find that really to be relevant, in the fact that it doesn’t really matter what she thought, it’s what she did, how she behaved, and whether or not she violated the third prong of RAMIREZ by threatening or acting in some manner on her suspicions. For instance, if she suddenly treated Mr. McAdams like a criminal by hollering at him, threatening him, frightening him, acting, you know any type of aggression, or even more importantly to start confronting him, as the third prong says, with the knowledge that she already had.
The testimony clearly indicates — first of all there was a search warrant obtained based on the observations at both houses — that there were some significant concerns. There was blood found, there was something that appeared to be a bullet hole, you’ve got at least one known missing person, possibly two. There was a broken cell phone, glass, dog food scattered about, a well-known very reliable employee missing out of her home for — out of her work for a couple of days without excuse. There was the pending divorce. There was all it could have gone on and on. And I don’t find that through the evidence presented that these — I find that those questions as to whether or not they threatened, the defendant was threatened, frightened or spoken to contemptuously, or whether or not he was confronted with any evidence that was going to be used against him, I find that those questions are all answered in the negative.
I watched, again, several hours — well, I watched the whole tape and hours of Detective Christensen and then Detective Arey alone, there was never any raised voices, never any threat. The only, the only incidents where anything was mentioned about evidence that had been already seen or was in hand or suspected of having was the blood and some of the clothing.
*407 But in light of the whole circumstances and the tone of the whole interview, I don’t find that he was in custody under prong three based on the totality of the circumstances.
And finally under prong four, “Whether the suspect is informed that he is free to leave.”
The testimony was uncontroverted that he was informed that he was free to leave, at least once, possibly twice depending on whose [sic] testifying. But there was uncontroverted testimony that he was told at least once that he was free to leave.
So under the guidance of Ramirez, I find that the defendant was not in custody, at least to the point of when he’s admittedly in custody. That happened when Detective Arey read Miranda and placed him under arrest, he was clearly in custody at that point.
As did the trial court, we have viewed the entire video of Mr. McAdams’ interview with the detectives. We conclude that the trial court’s factual findings are supported by the video and by the testimony at the suppression hearing, and we agree with the trial court’s ultimate determination that Mr. McAdams was not in custody at the time he confessed to the murders.
The question remains, however, whether the detectives violated Mr. Mc-Adams’ right to due process under the Florida Constitution when they did not advise him of the presence of his lawyer. In support of his argument, Mr. McAdams relies on Haliburton v. State, 514 So.2d 1088 (Fla.1987). In Haliburton, police refused to advise a defendant that a lawyer who had been hired to represent him was in the police station and wished to speak with him. Id. at 1089. The court held that the officers’ actions violated the due process provisions of article 1, section 9 of the Florida Constitution. Id. at 1090.
We believe there is a critical distinction between this case and Haliburton. Unlike Mr. McAdams, the defendant in Halibur-ton was in custody and had been read his Miranda rights, which he had waived at the time his attorney was trying to see him. Id. at 1089. The court in Halibur-ton found the due process violation based on what it found to be misconduct by law enforcement in that it interfered with Hali-burton’s right to counsel during a custodial interrogation. Id. at 1090. Here, detectives were conducting a noncustodial interview with Mr. McAdams. Neither Hali-burton nor any other case McAdams cites holds that it is misconduct for law enforcement officers to refuse to interrupt a noncustodial interview to permit an attorney access to a suspect who has voluntarily agreed to be interviewed, and we decline to do so here. However, we certify the following question to be of great public importance:
DOES AN ADULT SUSPECT WHO IS NOT IN CUSTODY BUT VOLUNTARILY ENGAGES IN A LENGTHY INTERVIEW IN AN INTERROGATION ROOM AT A LAW ENFORCEMENT OFFICE HAVE A DUE PROCESS RIGHT TO BE INFORMED THAT A LAWYER HAS BEEN RETAINED BY HIS FAMILY AND IS IN THE PUBLIC SECTION OF THE LAW ENFORCEMENT OFFICE AND WISHES TO TALK TO HIM?
Our ability to distinguish Haliburton, however, extends only to the point at which Mr. McAdams confessed. After he confessed and received his Miranda rights he was admittedly in custody. The State nevertheless attempts to distinguish Hali-burton by pointing to the fact that the law enforcement officers in that case refused access to the attorney even in the face of a *408 court order — only relenting after a second court order. While the violation of the court order was obviously pertinent to the outcome in Haliburton, as we read the supreme court’s opinion it does not appear to us that the violation of the court order was determinative of the question of whether law enforcement’s conduct rose to the level of a violation of due process. Accordingly, we conclude that under Hali-burton, any evidence collected after detectives read Mr. McAdams his Miranda rights until they told him about the attorney was collected in violation of Mr. Mc-Adams’ right to due process under the Florida Constitution. Pursuant to Hali-burton, that evidence should have been suppressed.
Accordingly, we reverse Mr. McAdams’ judgment and sentences and remand for further proceedings consistent with this opinion.
ALTENBERND, J., Concurs.
DAVIS, C.J., Concurs in part and dissents in part with opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. t602, 16 L.Ed.2d 694 (1966).