# Supreme Court of Florida

_____

No. SC14-788
_____

**STATE OF FLORIDA,**
Petitioner,

vs.

**MICHAEL LINDSEY MCADAMS,**
Respondent.

_____

No. SC14-826
_____

**MICHAEL LINDSEY MCADAMS,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[April 21, 2016]

LEWIS, J.

This matter is before the Court for review of the decision of the Second

District Court of Appeal in McAdams v. State, 137 So. 3d 401 (Fla. 2d DCA

2014). In its decision, the district court ruled upon a question that it certified to be of great public importance. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.

## FACTS AND BACKGROUND INFORMATION

The Pasco County Sheriff's Office was notified that Lynda McAdams (Lynda), the estranged wife of Respondent/Cross-Petitioner Michael McAdams (McAdams), and her boyfriend/coworker, William Andrews (Andrews), had been reported missing by concerned family members. On October 21, 2009, a detective responded to Lynda's home on Palomino Lake Drive in Dade City and, after observing her truck parked at the residence, conducted a welfare check at the house. He found the door unlocked and walked through the residence. No one was present.

During the welfare check, the detective observed that the lid of the washing machine was open and a substance that appeared to be blood could be seen on the rim. Blood-stained clothing was inside the washing machine. The detective also observed latex gloves in the kitchen, along with rolls of duct tape. He departed the residence and notified a supervisor of his observations. McAdams was contacted, and he gave written consent for a search of the Palomino Lake Drive home.[1] During the search, in addition to other items of interest, there appeared to be blood

_____

1. The records of the Pasco County Property Appraiser listed McAdams as the owner of the home.

spatter on a wall, blood was discovered on clothing, and a bedroom door evidenced what appeared to be a bullet hole. A projectile was later recovered from the wall.

A different detective entered McAdams's separate residence in Spring Hill to perform a welfare check there with the consent of McAdams's father. When the detective walked through the garage, he observed a pair of blue-jean shorts that appeared to have blood on them. Further, a broken cell phone was found on a night stand and McAdams's father stated that it did not belong to McAdams. Law enforcement subsequently obtained a search warrant for the Spring Hill home. The warrant was executed at approximately 2:22 a.m. on October 23, and McAdams was not present. The shorts, a grey shirt, and a black belt were seized.

Later that morning, a detective with the Hernando County Sheriff's Office approached McAdams in the driveway of the Spring Hill home and asked if he would be willing to come to the sheriff's office to speak with detectives. McAdams understood that the detective was there because Lynda was missing and replied that he wanted to help. McAdams rode to the sheriff's office in the back of a deputy's vehicle, but he was not handcuffed.[2] The detective specifically informed McAdams that he was not under arrest.

---

2. The detective told McAdams that he could either travel to the sheriff's office in his own vehicle or ride in a police vehicle. McAdams elected to accept a ride from a deputy.

Upon his arrival at the Hernando County Sheriff's Office, McAdams was escorted to an interview room where he met with Pasco County Detectives Christensen and Arey. The encounter at the sheriff's office between McAdams and the detectives began at 11:55 a.m., and the interview was recorded in its entirety. During the majority of the interview, McAdams maintained that he did not know what happened to Lynda or Andrews. However, at 2:27:15 p.m., while McAdams was in the room with only Detective Arey, he commenced a confession in which he admitted that he fatally shot Lynda and Andrews on October 18, 2009. McAdams also confessed that he buried the bodies and discarded the weapon off a bridge. At 2:42:07 p.m., Detective Arey read McAdams the Miranda[3] warnings. After receiving the warnings, McAdams continued to speak with Detective Arey, and he subsequently directed law enforcement to the bodies.

At 2:04 p.m., while McAdams was being interrogated by the Pasco County detectives in the Hernando office, and before the confession commenced, an attorney retained by McAdams's parents arrived at that office. After determining that McAdams was being interrogated in the building, the deputy at the counter advised the attorney that it would not be possible to convey any information to the location where McAdams was being questioned by any means, including e-mail,

---

3. Miranda v. Arizona, 384 U.S. 436 (1966).

- 4 -

telephone, a knock on the door, or even a note slipped under the door. Although the attorney stated:

> I want all questioning to stop. I don't want anymore [sic] questioning to go on without my presence.

he was not allowed to see or otherwise communicate with McAdams in any manner. Facing that insurmountable obstacle, the attorney departed from the sheriff's office at 2:17 p.m., just ten minutes before McAdams commenced his confession. McAdams was first informed about the presence of the attorney only after he directed the detectives to the burial site. On November 10, 2009, McAdams was indicted on two counts of first-degree murder.

McAdams subsequently filed a motion to suppress any statements made to law enforcement, any evidence obtained as a result of those statements, and any audio or video evidence that resulted from those statements.[4] McAdams asserted that he was in custody when he was questioned by Detectives Arey and Christensen, and they failed to read him the Miranda warnings. McAdams also contended that he was improperly denied access to his attorney, who was actually at the sheriff's office while he was being interrogated.

---

4. McAdams also filed a separate motion to suppress evidence seized from the Palomino Lake Drive residence. The trial court denied the motion, and the Second District Court of Appeal affirmed the ruling. McAdams, 137 So. 3d at 403.

During the hearing on the motion to suppress, Detective Christensen

outlined the reason the attorney was not allowed to see or speak with McAdams:

DEFENSE COUNSEL:  What did they tell you as far as this lawyer in the lobby of the Hernando County Sheriff's Office?

CHRISTENSEN:  I was told that an attorney came up wanting to speak with Mr. McAdams.  And we discussed the situation about just an attorney showing up.  And that—

DEFENSE COUNSEL:  What did they tell you about the attorney, anything specific that you recall?

CHRISTENSEN:  I don't remember.  I don't even know who the attorney was.

DEFENSE COUNSEL:  Did they tell you that the attorney wanted to speak to Mr. McAdams and that he wanted the questioning to stop?

CHRISTENSEN:  I believe so.  But I know there was an attorney present, that he wanted to speak with Mr. McAdams, and I decided that the attorney wasn't going to have access to Mr. McAdams.

DEFENSE COUNSEL:  And why is that?

CHRISTENSEN:  Because he wasn't under arrest, and Mr. McAdams never requested for an attorney.

DEFENSE COUNSEL:  If he's not under arrest, why not let him talk to his attorney?

CHRISTENSEN:  Because there was no need to.  I did not have to have him have access to Mr. McAdams.

DEFENSE COUNSEL:  And that was your call . . . or someone else?

CHRISTENSEN:  It was ultimately my call.

DEFENSE COUNSEL:  And why not tell McAdams that his lawyer is out there?

CHRISTENSEN:  I didn't have to.

DEFENSE COUNSEL:  And what makes you think that you didn't have to, based on what?

CHRISTENSEN:  Because he was not in custody.  He came there on his own free will to discuss the disappearance of his wife.  And at that time he didn't confess to anything.

(Emphasis supplied.)

The trial court denied the motion to suppress on both the Miranda basis and the failure of law enforcement to notify McAdams with regard to the presence of the attorney for him.  With regard to the Miranda claim, the trial court considered the four-factor test approved in Ramirez v. State, 739 So. 2d 568 (Fla. 1999),[5] to provide guidance to courts in determinations as to whether an individual is in custody, which would require the warnings to be read.  The court concluded that

_____

5.  The Ramirez factors are:

(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; [and] (4) whether the suspect is informed that he or she is free to leave the place of questioning.

Id. at 574 (citing State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997)).

McAdams was in custody only when Detective Arey read the <u>Miranda</u> warnings and placed him under arrest.

With regard to the failure to advise McAdams of the attorney who had been retained by his parents and appeared at the sheriff's office, the trial court considered <u>Haliburton v. State</u>, 514 So. 2d 1088 (Fla. 1987) (<u>Haliburton II</u>), in which this Court reversed murder and burglary convictions and ordered a new trial where the defendant gave a statement while an attorney who had been retained on the defendant's behalf was at the police station requesting to speak with him. <u>Id.</u> at 1089. The trial court concluded that <u>Haliburton II</u> was distinguishable:

> In this case the attorney was long gone by the time that defendant was in custody. And there was no evidence even that the defendant had any idea that he had had—that someone had retained an attorney for him, no evidence of that whatsoever. And that in reading the Supreme Court cases, there seems to be some distinguishable facts as to whether or not <u>Haliburton</u>, the holding in <u>Haliburton</u> of suppression should be applied here.

After a jury trial, during which the video of the interview was played, McAdams was convicted of two counts of first-degree murder and was sentenced to life imprisonment.

The Second District Court of Appeal reversed the judgment and sentences. <u>McAdams</u>, 137 So. 3d at 408. The district court agreed with the trial court that McAdams was not in custody when he initially confessed to the murders. <u>Id.</u> at 407. The district court noted that <u>Haliburton II</u> involved a <u>custodial</u> interrogation,

and declined to hold that a refusal by law enforcement officers to interrupt an interview to allow an attorney access to a client who has voluntarily agreed to speak with police constitutes misconduct. However, the district court certified the following question as one of great public importance:

> DOES AN ADULT SUSPECT WHO IS NOT IN CUSTODY BUT VOLUNTARILY ENGAGES IN A LENGTHY INTERVIEW IN AN INTERROGATION ROOM AT A LAW ENFORCEMENT OFFICE HAVE A DUE PROCESS RIGHT TO BE INFORMED THAT A LAWYER HAS BEEN RETAINED BY HIS FAMILY AND IS IN THE PUBLIC SECTION OF THE LAW ENFORCEMENT OFFICE AND WISHES TO TALK TO HIM?

Id.

Nonetheless, the Second District held that once McAdams confessed and the Miranda warnings were read, he was in custody and should have been informed about the attorney, and the detectives violated McAdams's right to due process under the Florida Constitution when they failed to do so. Id. at 407-08. Based upon this violation, the Second District held that any evidence collected after McAdams was read his rights and until he was informed about the attorney should have been suppressed pursuant to Haliburton II. Id. at 408.

Both the State and McAdams petitioned for review of the certified question. For purposes of our analysis, we rephrase the question as follows:

> UNDER THE DUE PROCESS CLAUSE OF THE FLORIDA CONSTITUTION, WHEN MUST A PERSON WHO IS BEING QUESTIONED BY LAW ENFORCEMENT IN A NON-PUBLIC LOCATION BE NOTIFIED THAT AN ATTORNEY RETAINED

ON HIS OR HER BEHALF IS AT THE LOCATION AND AVAILABLE TO SPEAK WITH HIM OR HER?

**ANALYSIS**

The rephrased certified question is a pure question of law that requires interpretation of the Florida Constitution and is, therefore, subject to de novo review. Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So. 3d 1076, 1084-85 (Fla. 2008). To provide context and background as to the current state of Florida law on this issue, we summarize Haliburton II, and its predecessor decision, Haliburton v. State, 476 So. 2d 192, 193 (Fla. 1985) (Haliburton I).

**Haliburton I & II**

Haliburton was brought to a police station with regard to a homicide, read the Miranda warnings, and questioned. Haliburton I, 476 So. 2d at 193. The following then occurred:

> [Haliburton] submitted to a polygraph examination at 2:05 p.m. Meanwhile appellant's sister retained an attorney to represent him. The attorney called the police near the end of the polygraph examination and requested that the questioning stop. The attorney arrived at the police station a few minutes before 4 p.m. and asked to speak with appellant, but was not allowed to do so. Appellant gave a recorded statement from 3:56 until 4:20 p.m. that was played to the jury. By 4:18 p.m. the attorney had a telephone court order requiring that the police give him access to appellant. After the judge's second phone call, the police chief ordered that the interrogation cease, and the attorney was able to see appellant.

Id. Haliburton was convicted of burglary and first-degree murder, and he was sentenced to death. Id. On direct appeal, this Court held that the trial court erred

- 10 -

when it refused to suppress the statements that Haliburton gave after the attorney arrived at the station and sought access to his client.  Id.  We explained that because Haliburton was not notified of the attorney retained for him who was at the station and available to advise him, the waiver of the Miranda rights was invalid, and he was entitled to a new trial.  Id. at 194.  In support of the holding, we stated:

> Our emphasis is on fairness in apprising a defendant of the recourse available to him.  In order for the right to counsel to be meaningful, a defendant must be told when an attorney who has been retained on his behalf is trying to advise him.  If the defendant wishes to reject the opportunity for such advice, he may do so.

Id.

The State petitioned the United States Supreme Court for certiorari review, and the Supreme Court vacated Haliburton I for further consideration in light of the decision in Moran v. Burbine, 475 U.S. 412 (1986).  Florida v. Haliburton, 475 U.S. 1078 (1986).  In Burbine, an attorney telephoned the police station and advised that she would act as Burbine's legal counsel in the event the police intended to question him.  475 U.S. at 417.  The attorney was informed Burbine would not be questioned that day; however, he was actually questioned that evening.  Id.  After waiving his Miranda rights on three separate occasions, Burbine signed three statements in which he confessed to a murder.  Id. at 417-18.

- 11 -

During that time, Burbine was not notified of the telephone call from the attorney. Id. at 417.

The Supreme Court held that suppression of the confessions was not required under the Fifth Amendment to the United States Constitution. Id. at 428. The Supreme Court concluded that events occurring outside of a suspect's presence can have no impact on his or her ability to understand and knowingly waive a constitutional right. Id. at 422. It also rejected an expansion of Miranda that would require law enforcement to keep a suspect informed as to the status of his or her legal representation. Id. at 427. However, the Supreme Court specifically noted that nothing in its decision precluded the States from implementing different requirements under state law. Id. at 428. The Supreme Court further concluded that although deception by the police may rise to the level of a constitutional due process violation, the police conduct in Burbine was not of the type that "so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." Id. at 433-34.

On remand from the Supreme Court, this Court, in Haliburton II, held that the conduct of the police violated the due process provision of article I, section 9, of the Florida Constitution[6] and again granted Haliburton a new trial, stating:

6. Article I, section 9, provides:

[W]e must agree with Justice Stevens [in his <u>Burbine</u> dissent] that

> due process requires fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections. . . . <u>[P]olice interference in the attorney-client relationship is the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause prohibits. . . . Just as the government cannot conceal from a suspect material and exculpatory evidence, so too the government cannot conceal from a suspect the material fact of his attorney's communication.</u>

[475 U.S. at 467] (Stevens, J., dissenting).

514 So. 2d at 1090 (emphasis supplied).

## Due Process Under the Florida Constitution

Three theories have been posited as to what is required under the Due Process Clause of the Florida Constitution when an attorney retained on behalf of an individual who is being questioned in a non-public area of a law enforcement office appears at the office. They are:

> 1) Absent some other outrageous conduct, no due process violation occurs under the Florida Constitution where the police fail to inform a person about the appearance of an attorney who has been retained on his or her behalf, even if he or she is in custody (the position taken by the State).

---

**Due process.**—No person shall be deprived of life, liberty or property without due process of law, or be twice put in jeopardy for the same offense, or be compelled in any criminal matter to be a witness against oneself.

2)  The Due Process Clause of the Florida Constitution requires a person to be informed about the appearance of an attorney who has been retained on his or her behalf once he or she is in custody (the holding of the Second District).

3)  The Due Process Clause of the Florida Constitution requires a person to be informed about the appearance of an attorney who has been retained on his or her behalf regardless of whether he or she is in custody (the position taken by McAdams).

The State's theory simply does not lead to a practical application.  Were this Court to adopt such a position, the police could routinely conceal from a suspect who is even in custody the fact that an attorney who has been retained on his or her behalf is at the law enforcement office and is available to speak with him or her. This application would constitute a complete departure from the conclusion of Haliburton II that under the Florida Constitution, "[p]olice interference in the attorney-client relationship is the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause prohibits."  Id. (quoting Burbine, 475 U.S. at 467 (Stevens, J., dissenting)); see also Walls v. State, 580 So. 2d 131, 133 (Fla. 1991) ("Due process contemplates that the police and other state agents act in an accusatorial, not an inquisitorial, manner.").

Further, to adopt the interpretation of the State would inject uncertainty into the law.  Questions would arise as to what type of conduct, coupled with the failure to inform the individual of the attorney's presence, would be sufficiently

- 14 -

outrageous to rise to the level of a due process violation.  No bright-line rule would exist for trial courts to apply or law enforcement officers to follow.  Instead, outrageousness would be evaluated on a case-by-case basis, creating a substantial risk that trial courts would reach different conclusions on similar facts.  This would muddy, rather than clarify, the level of conduct by law enforcement officers that is constitutionally permissible.  Therefore, we reject the position advocated by the State.

Moreover, while Haliburton II involved a situation where the defendant was in custody, the present case demonstrates why it is also unworkable for the due process rights of an individual under the Florida Constitution to be contingent upon custodial status with regard to access to a retained attorney.  It is clear that as soon as a retained attorney arrives at the law enforcement office, the questioning of the individual can intensify significantly with the goal of obtaining a confession.[7]

---

7.  In Bruce v. State, 92 So. 3d 902, 906 (Fla. 4th DCA 2012), the Fourth District Court of Appeal concluded that whether interrogating officers are actually aware of a retained attorney's arrival at the law enforcement office is irrelevant to the right of the person being questioned to be informed about the attorney:

> The police cannot rely on the failure to notify interrogators of a lawyer's presence to skirt the . . . due process requirements imposed by Haliburton II.  Thus, the fact that the interrogating detectives in this case were unaware of [the attorney's] presence at the station house is without legal significance.  To allow the police to hide behind the imprecise standard of the good faith ignorance of the

Here, within minutes of the arrival of the attorney at the Hernando County Sheriff's Office, the questioning of McAdams by the detectives became more pointed and aggressive. Detective Arey confronted McAdams with the blood and DNA evidence discovered at both of his residences. Further, Arey clearly conveyed to McAdams that law enforcement knew he was responsible for the disappearances of Lynda and Andrews. Although probable cause may have existed to arrest McAdams, Detective Arey continued to apply psychological pressure until McAdams confessed.

We conclude that the only way to properly protect the due process rights of citizens under the Florida Constitution is to implement a bright-line rule. Otherwise, determinations of when voluntary questioning evolves into custodial interrogation will spawn hundreds of thousands of dollars in costs or expenses and hours in litigation. Therefore, we now hold that when an individual is being questioned in a non-public area, and an attorney retained on his or her behalf arrives at the location, the Due Process Clause of the Florida Constitution requires

---

interrogators would encourage law enforcement to be deaf and blind to a lawyer's attempts to contact his client in the station house.

We agree with the conclusion reached by the Fourth District. In the present matter, once it was determined that McAdams was at the Hernando County Sheriff's Office, a duty existed for law enforcement to inform him that an attorney retained on his behalf was present. See id. ("Because they are responsible for the suspect's isolation, the police have a duty to act reasonably, diligently, and promptly to provide the defendant with accurate information.").

that the police notify the individual of the attorney's presence and purpose.

Pursuant to this holding, a person can no longer be deprived of the critical

information that an attorney is present and available to provide legal advice based

on pure police conjecture that the individual is not in custody. We also cannot

allow law enforcement to refuse to interrupt an interview, as occurred here. Under

the interpretation of the Due Process Clause of the Florida Constitution that we

adopt today, it is the individual, rather than law enforcement, who is given the

knowledge and power to decide whether to take advantage of the attorney's

services.

In light of the foregoing, we hold that McAdams's right to due process under

the Florida Constitution was violated when law enforcement officers failed to

inform him that an attorney retained by his parents had arrived at the Hernando

County Sheriff's Office and was available to assist him. Pursuant to this holding,

the determinations of both the trial court and the Second District as to when

McAdams had the right to be notified about the attorney were in error.

**Custodial Status**

Moreover, although custodial status is irrelevant to a person's right under the

Florida Constitution to know that an attorney retained on his or her behalf is at the

location where he or she is being questioned, we also conclude that the trial court

and the district court erred when they determined that McAdams was not in

- 17 -

custody before he confessed to the homicides at 2:27:15 p.m., and a <u>Miranda</u>

violation occurred when this confession was admitted during trial.

In <u>Miranda</u>, the Supreme Court explained that:

the Fifth Amendment privilege is available outside of criminal court
proceedings and serves to protect persons in all settings in which their
freedom of action is curtailed in any significant way from being
compelled to incriminate themselves.  We have concluded that
without proper safeguards the process of in-custody interrogation of
persons suspected or accused of crime contains inherently compelling
pressures which work to undermine the individual's will to resist and
to compel him to speak where he would not otherwise do so freely.

384 U.S. at 467.  Failure to provide the <u>Miranda</u> warnings prior to custodial

interrogation generally requires exclusion from trial of any post-custody statements

given.  <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 (2004); <u>see also</u> <u>Deviney v. State</u>,

112 So. 3d 57, 79 (Fla. 2013) ("[I]f a defendant's statement resulted from a law

enforcement officer's illegal actions, that evidence is 'fruit of the poisonous tree'

and the trial court should exclude it from trial.").

Interrogation occurs when a state agent asks questions or engages in actions

that a reasonable person would conclude are intended to lead to an incriminating

response.  <u>Traylor v. State</u>, 596 So. 2d 957, 966 n.17 (Fla. 1992).  We have further

explained that:

Custody for purposes of <u>Miranda</u> encompasses not only formal
arrest, but any restraint on freedom of movement of the degree
associated with formal arrest.  <u>See</u> <u>Arbelaez v. State</u>, 626 So. 2d 169,
175 (Fla. 1993).  A person is in custody if a reasonable person placed
in the same position would believe that his or her freedom of action

was curtailed to a degree associated with actual arrest. See Traylor, 596 So. 2d at 966 n.16; Roman v. State, 475 So. 2d 1228, 1231 (Fla. 1985). "The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation." Davis v. State, 698 So. 2d 1182, 1188 (Fla. 1997), cert. denied, 522 U.S. 1127.

Ramirez, 739 So. 2d at 573. Although we approved in Ramirez a four-factor test to provide courts with guidance in determining whether an individual in is custody,

> the ultimate inquiry is twofold: (1) the "circumstances surrounding the interrogation;" and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

Ross v. State, 45 So. 3d 403, 415 (Fla. 2010) (quoting Yarborough v. Alvarado, 541 U.S. 652, 663 (2004)). Courts are to consider the totality of the circumstances in determining whether a reasonable person would believe that his or her freedom of action has been curtailed to a degree associated with actual arrest. Caldwell v. State, 41 So. 3d 188, 197 (Fla. 2010). Further, while precedent remains a guide, custody determinations are heavily fact dependent. Rigterink v. State, 2 So. 3d 221, 246 (Fla. 2009), vacated on other grounds, 559 U.S. 965 (2010).

We have applied these standards and conclude that although McAdams was not in custody initially, the encounter with the detectives steadily evolved into a custodial situation in which a reasonable person would not have felt free to terminate the interview and leave. The record reflects that McAdams voluntarily accompanied law enforcement to the Hernando County Sheriff's Office. When

approached in his driveway by a detective, McAdams acknowledged that his wife was missing and expressed a desire to help law enforcement. McAdams was told that he was not under arrest, and he accepted a ride to the sheriff's office after he was informed he could drive his own vehicle. Although he rode in the back of a deputy's vehicle, he was not handcuffed. Further, McAdams's parents arrived at the house before he departed, and he was allowed to speak with them.

Upon arrival at the sheriff's office, McAdams was placed in a small room with a desk and three chairs that was located in a non-public area. During the motion to suppress hearing, Detective Christensen described herself, Detective Arey, and McAdams as being "pretty close." McAdams's access to the door of the interview room was not blocked, and there is no indication that the door was ever locked. At the beginning of the interview, Detective Christensen informed McAdams that he was not under arrest, and he confirmed that he came to the sheriff's office voluntarily. At no point did the detectives yell at him or even raise their voices—the interview was conducted at all times in a conversational tone. After approximately 1.5 hours of questioning, McAdams was offered a drink, and the detectives also brought him a slice of pizza.

At 1:26:17 p.m., McAdams was given a restroom break. However, McAdams testified during the motion to suppress hearing that he was only allowed to have a restroom break while escorted to the restroom by three Hernando County

officers, <u>and the officers entered the restroom with him</u>.  McAdams further testified that he could not exit the restroom unless the officers moved.  It is questionable that a reasonable person would have felt free to leave the sheriff's office under such circumstances.

Further, whereas before the restroom break, the interview focused mainly on McAdams's movements during the week that Lynda and Andrews disappeared, and his relationship with Lynda, the tone began to change shortly after the break. Arey noted that McAdams's parents had already lost their daughter to an aneurysm and informed McAdams that his mother was "pretty fragile" and "really very, very distraught" about the current situation.  McAdams confirmed that the day before, he had taken a gun from his parents' residence and contemplated suicide due to financial troubles and family difficulties, but ultimately decided against it. Detective Arey later informed McAdams:

> I've got a—a theory as—as to what may be going through your head and to what led you to try to go find some peace yesterday and, you know . . . <u>this is the time for the rest of the story</u>.  I'm just, I'm being really honest with you.  I think you can look at me and know that I'm not trying to bullshit you.  I'm not trying to be—play head games with you.  I'm being real honest and real up front.  <u>And I think that there's quite—quite a bit more that you could probably tell me</u>.  And I'm just asking you from man to man with no disrespect to you.  You know, I'd really appreciate if you'd tell me the rest of what I can see that you want to tell me.

(Emphasis supplied.)  When McAdams asked Detective Arey what he thought McAdams wanted to tell him, Arey responded, "Well, I think there's some more things that may have gone on."  Detective Christensen followed up:

> What happened on Sunday and Monday?  Something obviously went down on Sunday, between Monday, either between you, your wife, or the boyfriend.  Something went on at your house, and it probably continued on to your new house.

She later asked McAdams if he bled in either of his residences, noting that he had cuts on his hands.  She stated, "I'm talking bleeding, I'm not talking about a little smudge of, you know, 'cause you scratched yourself."  McAdams explained that the cuts on his hands were snake bites because he handles reptiles.

Detective Arey also sought to establish a rapport with McAdams through commiseration.  Arey confided that he too had been through a divorce and recognized that it can be an "emotional roller coaster."  In response to a question from McAdams as to how many men would feed their wives' horses so that their wives could spend time with their new boyfriends, as McAdams agreed to do for Lynda, Arey replied: "[F]rom a man's perspective, I can tell you that a person—a person can only take so much crap.  That's—a person can only take so much."  Arey later continued:

> [T]here's no middle ground in—in love.  Love is—is—is a strong emotion, and when that emotion swings the other direction, we don't think straight.  Been there, done it.  I mean, and I—I can—I can talk about those things out of personal experience.  And I know how

- 22 -

quickly things can, during highly emotional situations, clear judgment doesn't—doesn't always happen.

Detective Christensen then told McAdams:

> [S]omething happened either between you, the boyfriend and her, something happened 'cause this isn't, this is not your—just your—you know, you guys live out in the woods, you know—it's not like somebody just came over and, and did something bad to any of you guys, you know, this—this is a personal, isolated incident. Something happened.

She noted there were things at both the Palomino Lake Drive and Spring Hill residences that "just don't look right."

Detective Arey left the interview room at 2:03:37 p.m. and returned at 2:04:32 p.m.[8] Upon his return, Detective Christensen mentioned blood found at the Palomino Lake Drive residence and blood found on clothing at McAdams's Spring Hill residence. McAdams claimed he did not know anything about the blood. At 2:05:16 p.m., Detective Arey asked Detective Christensen to leave the room. He then moved to the chair that Detective Christensen previously occupied, which was closer to McAdams. The following dialogue then occurred:[9]

> AREY: I think you can tell when I look at you, I'm not staring you down. I'm giving you respect. I'm looking you in the eyes, and I'm being honest with you. I have been in [unintelligible] a divorce that I never wanted.

---

8. This is the approximate time that the attorney arrived at the sheriff's office.

9. We quote this interaction in its near entirety to demonstrate the direction and manner of the interrogation.

MCADAMS:  So you can, you can—

AREY:  Almost verbatim, I know, and I can tell you, some of the shit that went through my head turned my brain to fucking mashed potatoes.  I can relate.  I know. . . .  Mike, I've been in this situation, literally.  I know, I know what thoughts have gone through my head.  I can relate.  For the sake of you, for your conscience, for your family, for everything.  I'm telling you, your conscience and the weight of—of—of your family, this is—this is it.  This is the time to talk to me and tell me what actually happened.

MCADAMS:  Well, what's [Detective Christensen] talking about blood . . . and would you fill me in, or no on that?

AREY:  Yeah, I will. 'Cause, again, I mean, literally, 'cause I'm being honest.  I've been inside your house.

MCADAMS:  Right.

AREY:  [B]oth of them.  We're not CSI.  If we were, we could solve everything that happened in sixty minutes with no paperwork.

MCADAMS:  Yup.

AREY:  We'd be super fucking heroes.  We're not.  But, we do have most of that equipment.  It just takes a lot longer.  The evidence that they've got is really, really strong.  We've got tons of blood evidence, tons of DNA.  I was at your Glover house last night. . . . The shorts that were there, with the blood on 'em.  The t-shirt.  All of it.  That's what they're talking about with the evidence.
    You know, what you know about the knowledge, with your snakes, and your things like that, I can't begin to touch.

MCADAMS:  Mmm-hmm.

AREY:  I know some basics but I can't begin to touch 'em.  With my job, I've got my knowledge about what I do the way you do about your snakes.  And pretty much, when you and I are talking and we're together, I've already got a pretty dang good idea of—of what

went down. I wasn't there. I wasn't a witness. I can't tell you I know what happened.

MCADAMS: Can I just say one thing?

AREY: Absolutely.

MCADAMS: A lot of that blood on my shirt is probably rat blood. Because I killed—

AREY: Okay. Well a lot of it's—a lot of it's not. Because we already tested for the human blood, and the DNA is already there.

MCADAMS: Alright.

AREY: So, and again, I'm not—I'm not gonna to insult you, and—and try to play games with you.

MCADAMS: No, I—I can tell.

AREY: I just, I'm not gonna do that. Because I'm not going to try to treat you like some eighteen-year-old crackhead thug and play games with you. And that's why I'm just being very honest. I'm laying my stuff out on the table. And I'm telling you that—that this— this isn't gonna go away. And, this is—this is the time for you and I to—to—to lay it out to what actually happened.

MCADAMS: Let me ask you this. If we don't lay it out on what exactly happened, then what happens?

AREY: Things get uglier. I don't mean ugly in that sense. But it becomes very public. Perhaps warrants issue. All—all sorts of things, you know, and it's going to be media at your parents' house. It'll be a zoo. It'll be a zoo. 'Cause it won't go away. I mean, and again, you know, the evidence . . . it's all there. And—and, it won't go away. So the difference in you and I discussing this here, now, quietly, low profile, versus a big profile thing, your daughters, your parents. Crap like that. And I know you can tell, I'm not bullshitting.

MCADAMS: Yeah.

- 25 -

AREY:  I'm just—you know.  I'm not bullshitting.  And trust me.  I'm talking to you, and you know I'm being genuine 'cause I have been there.

MCADAMS:  Is there any way you can give me a couple of days to think about it, or no?

AREY:  Regretfully, everything's already set in motion.  I mean, I could tell you that and it wouldn't be the truth, and I'm not gonna lie to you.  I just—I wouldn't want to be lied to.  It's—it's—it's time, Mike, I mean, it's—it's just not gonna go away.

MCADAMS:  Well, what am I—what I'm saying is am I gonna be able to leave here today or no?

AREY:  I don't know, Mike.  I don't know.  And again, I'm looking you in the eye, man to man, being honest.  I'm just—I'm not going to bullshit you.

. . . .

AREY:  . . . .  I'm telling you Mike, your conscience, for the sake of your family, this needs to stay as calm as it can be, and that's the opportunity we have here today.
What happened out there at the house?

MCADAMS:  . . . .  I mean, as far as I know, her—her boyfriend could have killed her.  I don't know who killed her.  I don't know who killed anybody.  I really don't.

AREY:  Think about what I'm telling you, Mike.  I'm not— you've probably haven't had a whole lot of dealing with law enforcement.

MCADAMS:  No I haven't.  And I like—

AREY:  But I think you know enough that I'm just being honest.  And what I'm asking you to do is to be honest with me, tell

- 26 -

me what happened, and let's keep this as quiet and as easy on your family as we can possibly keep it.

. . . .

AREY:  And Mike, I've probably been within a few drinks of—of doing things that would have—I've been there, I know.  And I've known that in those situations, alcohol eases the pain.

MCADAMS:  Yep, that it does.

AREY:  Regretfully, it fucked my judgment up, but it eases the pain.
Did she tell you he was coming over?

MCADAMS:  Who, my wife?  No.  No.  No, she did not.

AREY:  Then what happened?

MCADAMS:  Your guess is as good as mine.

AREY:  Mike, Mike.  Look at me.

MCADAMS:  I am looking at you.

AREY:  I know.  But you know what?  Do you have any doubt in your mind that I have done anything but be honest with you?

MCADAMS:  You've been nothing but honest with me.

AREY:  Don't you think you should give me the same respect that I'm giving you?  And I'm being honest with you because I don't want to insult your intelligence.  I'm being honest.

. . . .

AREY:  Mike, it's—this needs to get settled today.  For the sake of everything and everybody.
How much had you been drinking?

MCADAMS:  Too much.

. . . .

AREY:  . . . .  What went wrong when you drank too much that night or that day?

MCADAMS:  I went home and went to sleep.

AREY:  What are your intentions, Mike?

MCADAMS:  My intentions as far as what?

AREY:  What's gonna happen from here?

MCADAMS:  Hopefully, my wife's gonna show up.

AREY:  We both know that's not the case.

MCADAMS:  How do you know that?

AREY:  From all that evidence.  I'm telling you, Mike.  It's not going to go away.  And I really had hoped that you would have tried to keep this as easy and as quiet as possible and spare the rest of your family because, last night, your mother was frickin' beside herself.  You know, if—if for no other motivation to—to—to try to make this resolve as quickly and quietly as possible, you know, your family loves you, and they're going to love you no matter what.

MCADAMS:  And I love them.

AREY:  Then, knowing that this isn't going to go away, try to spare them some of the—the heartache.

MCADAMS:  Well, let me ask you this.

. . . .

MCADAMS:  What would I be looking at?

- 28 -

AREY:  Honestly, until we get done talking, and you tell me exactly what did happen, I can't answer that.  I'm being honest.

MCADAMS:  I mean, in your professional opinion. How mu—how long am I looking?  Just off, just—top of your head.

AREY:  You know what?  Depending, depending on the totality of what—what happened, the circumstance, I don't know.  It could be anywhere from nothing to a lot.  I—I don't know.  Until we know, and that's one of the reasons I'm asking you, what actually happened.  You know what I'm saying?  Alcohol's a factor.  Well, you know, it's common knowledge, alcohol affects judgment.  Okay, I mean, so there's all sorts of things.  Honest to gosh, I'm not trying to be evasive.

MCADAMS:  No, you've been—

AREY:  I'm just—I don't wanna bullshit you.

MCADAMS:  Well let—can I ask you this then, is there any way we could—you could you talk to the DA and see what kind of time I would be looking at?

AREY:  You know what they're gonna tell me?  Until they know what's happened, they can't answer.  I can tell you this—that honesty, the cooperation that you're giving, how you're being a gentleman.  That goes a long ways, an awful long ways, 'cause nobody likes just a flagrant asshole.  And that, there's no statute for that, but how people are treated.  You, you have been—and you're a gentleman.

MCADAMS:  Yeah.

AREY:  What went wrong?

MCADAMS:  Ah, if you could just give me five, ten years.  Maybe if I could go insanity or something.  You think I'm capable of that?

AREY:  And I—I cannot guarantee that.  I just can't.  I would love to be able to sit here and tell you yes.  But I can't.  Until I know, and until everybody knows exactly what went down, I don't know.  But I can tell you that your cooperation, your honesty, alcohol being involved, those are all factors that—that come into consideration.  I know I may not be telling you exactly what you want to hear.  I'm just, and I'm being honest with you, Mike.  Just being honest.  That's what I'm asking from you in return.

What went wrong?

MCADAMS:  Well, I tell you, I—I can't—I don't want [to] do a twenty-year kickout.  I can't do it.

AREY:  I understand that.  And I can tell you that <u>whatever I can do, I'll go on behalf for you</u>.  I've been there.  I know.  And you know I'm being honest about that.

MCADAMS:  Do you mind getting me a little bit more soda please, and then we'll talk?

AREY:  Sure. Yeah.

(Emphasis supplied.)  Upon Detective Arey's return, the dialogue continued:

MCADAMS:  So where do we go, what—what happens from here now?

AREY:  Well, you and I, we talk it out, and then we see where we're—there's a lot of options, there's a lot of things.  'Cause again, I don't know exactly where—what went down.  I'm mean, I've got a good idea.  But, you know, there may be things that when you tell me what actually happened, that make the situation a whole lot better for you.  'Kay?  That's why it's so important that you and I talk this out.  We'll see where we're at.  So you tell me where, at what point, and what went wrong.

And remember, <u>you're talking to someone who has sat there in the shoes that you've been having to wear.  There['s] no prejudgment on my part.</u>

- 30 -

MCADAMS:  Yeah, <u>but you're not gonna have to go where I gotta go</u>.

AREY:  Well, you're not there yet.  And, uh, keep the faith. What went wrong?

MCADAMS:  <u>You guys know what happened.  It's right there in black and white.</u>

AREY:  I know, but, what—how did it go down?  I mean, what—what happened that—that kicked it off?

(Emphasis supplied.)  Thereafter, McAdams commenced his confession.

There is not necessarily a single specific comment, question, or circumstance that converts an encounter from noncustodial to custodial.  A situation can commence as a voluntary interaction with police, but slowly intensify and become more pressured, pointed, and accusatory until it evolves into custodial status.  The circumstances of this interview, which involved: (1) an escort to, and inside, the restroom by multiple officers; (2) accusatory statements that there is human blood and DNA evidence at both of McAdams's residences, and the evidence is "really, really strong," indicating to McAdams that the police believed he was the prime suspect in what had happened to Lynda and Andrews; (3) repeated assertions that the situation will not "go away"; (4) being informed that a couple of days are not available to consider the matter because "everything's already set in motion"; and (5) being advised that the possibility of leaving the sheriff's office that day is uncertain, would lead a reasonable person to conclude

that he or she was not at liberty to terminate the encounter and depart from the sheriff's office. Ross, 45 So. 3d at 415.

The fact that McAdams asked Arey about possible penalties and defenses and stated "[y]ou guys know what happened. It's right there in black and white," prior to the confession demonstrates that McAdams believed the police possessed sufficient evidence to arrest him for a crime. Therefore, based upon a totality of the circumstances, we hold that McAdams was in custody before he commenced his confession at 2:27:15 p.m., and the Miranda warnings should have been given prior to that time. Accordingly, both the trial court and the district court erred when they held that McAdams's pre-Miranda confession was properly admitted during trial.

Moreover, this analysis supports our earlier conclusion that it is unworkable for the due process right of an individual to be advised of a retained attorney's presence at a law enforcement office to be contingent upon only custodial status. From the time that Detective Arey asked Detective Christensen to leave the interview room so that he could speak with McAdams alone until 2:17 p.m.—a time period of almost twelve minutes—an attorney retained by McAdams's parents was at the sheriff's office attempting to obtain access to McAdams. It was during this time period that Arey informed McAdams about the "tons" of blood and DNA evidence, that McAdams could not have a couple of days to consider the matter,

and that it was unclear whether McAdams would be allowed to leave the sheriff's office that day. As previously discussed, the attorney was denied access to his client, and McAdams was not notified about the attorney until after he directed the detectives to the bodies.

Further, during the entire one-on-one interaction between Detective Arey and McAdams prior to the confession, the detective used numerous interrogation tactics to gain McAdams's trust and wear down his resistance. These tactics included suggestions that (1) McAdams spare his family heartache and a media "zoo"; (2) Arey too had been involved in a difficult divorce, so he knew what McAdams was experiencing and would not judge him; (3) McAdams's role in what happened to Lynda and Andrews would inevitably be established by the "tons" of "really strong" evidence, so it would be in McAdams's best interest if he cooperated and confessed; and (4) Arey would speak favorably on his behalf if McAdams confessed. Detective Arey was well aware that McAdams was in a fragile state because McAdams admitted he had contemplated suicide the previous day because of financial and familial stress.

We have previously recognized that "the modern practice of in-custody interrogation is psychologically rather than physically oriented." Rigterink, 2 So. 3d at 251. Had McAdams been notified with regard to the attorney who had been retained on his behalf and chosen to take advantage of that attorney's services, he

would have been insulated from these tactics, which, while initially conveyed in a compassionate and sympathetic fashion, were unquestionably utilized solely for the purpose of obtaining a confession.

**Precedent**

Precedent supports our conclusion that McAdams was subject to custodial interrogation. In <u>Ross</u>, we held that a noncustodial interrogation turned custodial when the defendant was informed that blood evidence on his clothing matched blood found at the crime scene, and he was told by the detective that "this evidence could not be disputed." 45 So. 3d at 410; <u>see also</u> <u>id.</u> at 417 ("Once the police informed Ross that they had his bloody pants that matched the crime scene, a reasonable person would not have felt at liberty to terminate the interrogation and leave. At this point the officer should have advised Ross as to his <u>Miranda</u> rights.").

In <u>Mansfield v. State</u>, 758 So. 2d 636, 644 (Fla. 2000), a custodial interrogation occurred where the defendant was confronted with evidence that strongly suggested his guilt (a pager found at the murder scene was traced to the defendant), he was never informed that he was free to leave, and the questions that were asked "made it readily apparent that the detectives considered him the prime, if not the only, suspect." <u>Cf.</u> <u>Hunter v. State</u>, 8 So. 3d 1052, 1062-63 (Fla. 2008) (holding that interview was not custodial prior to the reading of the <u>Miranda</u>

- 34 -

warnings, in part, because the defendant was not a person of interest at the time he went to the police station, but had been identified as an acquaintance of a person who had already been taken into custody; "the purpose of the interview was to learn about Mr. Victorino and not necessarily about Mr. Hunter.").

Here, consistent with <u>Ross</u> and <u>Mansfield</u>, McAdams was confronted with evidence that strongly suggested his guilt, i.e., human blood and DNA evidence. Further, Detective Arey's statement that "it's time, Mike, I mean, it's—it's just not gonna go away," communicated to McAdams that he was considered to be the prime, if not the only, suspect in what had happened to Lynda and Andrews. Once this evidence was presented, McAdams was not told he was free to terminate the encounter. To the contrary, he was informed that it was unclear whether he would be allowed to leave the Hernando County Sheriff's Office that day.

Further, lower courts have considered whether a law enforcement officer questioned a defendant's version of events or accused him of lying in determining whether the defendant was in custody for purposes of <u>Miranda</u>. For example, in <u>Meredith v. State</u>, 964 So. 2d 247, 249 (Fla. 4th DCA 2007), after voluntarily travelling to a law enforcement office, the defendant was notified that his ex-girlfriend's younger brother had alleged that the defendant had touched him inappropriately. The detective informed the defendant that he was not under arrest and stated that he just wanted to get the defendant's "side of the story." <u>Id.</u> After

the defendant told the detective that the touching occurred during either wrestling or playing "show and tell," the detective did not question these explanations and even told the defendant, "relax, I'm not calling you a child molester." Id. at 249, 252. Based upon the low-key interrogation tactics, the consolatory tone of the detective, and the failure of the detective to challenge the defendant's explanation for the inappropriate touching, the Fourth District held that the questioning was not custodial for purposes of Miranda. Id. at 252-53.

Similarly, in State v. Pitts, 936 So. 2d 1111, 1118 (Fla. 2d DCA 2006), after the defendant (Pitts) voluntarily rode to a sheriff's office substation, law enforcement officers interviewed him with regard to property he pawned that belonged to one of two missing men. Pitts admitted he had been the passenger in a car that had been involved in a police chase. Id.[10] When the officers told Pitts that they believed he knew the location of the missing men, he admitted that he pawned the items, but said they were given to him by someone named Tavares "T.J." Wright, and he did not know the property was stolen. Id.

During a subsequent interview that occurred at a different location, the supervising officer, Captain W.J. Martin, wrote on a pad, "TJ says [Pitts] killed

---

10. The police believed that the vehicle involved in the chase had been in the possession of the missing men at the time of their disappearances. Id.

these guys," and left the pad in the room with Pitts. Id. at 1119.[11] After seeing the note, Pitts denied the allegation and said he was not present. Id. Martin responded, " 'you and I both know that ain't true, you were there, and you know where these guys' bodies are, don't you.' " Id. After further questioning by the police, Pitts admitted that he was present when the murders occurred, but Wright was the person who carjacked the men and shot them. Id. at 1120. Pitts stated that at the request of Wright, he held a gun on the men while they were in the backseat. Id.

In concluding that Pitts was not in custody at the time he made these admissions and before he was read the Miranda warnings, the Second District stated with regard to the fabricated accusation by Wright:

> Martin did not specifically say that he believed the accusation made by T.J. was true. That circumstance would tend to lessen the impact of the accusation on a reasonable person in Pitts'[s] situation. The indirect manner in which the accusation was presented to Pitts would also suggest to such a reasonable person that the police were not prepared to take Pitts into custody based on the accusation. Although Martin told Pitts of his suspicion that Pitts was "there," this is not a case where the questions and comments of the officers "made it readily apparent that the detectives considered him the prime . . . suspect."

---

11. The decision of the Second District notes that Wright made no such accusation against Pitts. Id. at 1119.

Id. at 1128 (quoting Mansfield, 758 So. 2d at 644).[12] Conversely, here, when

McAdams tried to explain that the blood on his clothing at the Spring Hill

residence was likely rat blood, Detective Arey immediately told McAdams that his

explanation was inconsistent with the evidence because the blood on the clothing

was human. Further, unlike Pitts, and consistent with Mansfield, upon being

confronted with the presence of "tons" of DNA and blood evidence at both of his

residences, a reasonable person in McAdams's situation would feel that he were

the prime, if not the only, suspect in the disappearances of Lynda and Andrews.

The State relies heavily on Pitts to assert that McAdams was not in custody

at the time he initially confessed. The State notes that Martin told Pitts, "Sammy, I

have been doing this a long time now, I think you know more than what you're

telling us. I actually believe that you were there." Id. at 1119. Further, according

to the Second District,

> Martin said, "Sammy, you know this thing is eating you up inside, and
> you probably see those boys laying there every time you close your
> eyes and you know you want to talk about it . . . . [T]he truth will set
> you free . . . don't bottle this thing up inside of you." Martin also said
> that the missing young men "deserved a proper burial" and that their
> families "deserve[d] to know what had happened." With tears welling
> up in his eyes, Pitts said, "I got a kid, can I go home if I tell you what
> happened or will I go to jail[?]" Martin responded that he could not

_____

12. Wright was eventually convicted and sentenced to death for the murders
of the two men, whereas Pitts received only life sentences. See Wright v. State, 19
So. 3d 277, 283 n.2 (Fla. 2009). This Court held that Wright's death sentences
were not disproportionate to the life sentences received by Pitts. Id. at 305.

> tell him "one way or the other" because he did not know what Pitts would tell him.

Id. at 1119 (emphasis supplied). While the emphasized language is similar to what Detective Arey told McAdams, the two cases are factually distinguishable. In its decision, the Second District specifically noted that:

> A reasonable person understands that the police ordinarily will not set free a suspect when there is evidence "strongly suggesting" that the person is guilty of a serious crime. That does not mean that whenever a suspect is confronted with some incriminating evidence, the suspect is in custody for purposes of Miranda. The significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect's position as well as the nature of the offense. If a reasonable person in the suspect's position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping, that circumstance militates strongly toward the conclusion that the suspect is in custody.

Id. at 1128 (emphasis supplied) (footnote omitted). The Second District then held with regard to the fabricated accusation by Wright, "[a] reasonable person understands that ordinarily the police do not take a suspect into custody on the basis of a potentially self-serving accusation that is unsupported by any details concerning the circumstances of the crime." Id.

Pitts was confronted with an uncorroborated accusation that he killed the victims. Further, he was only told that the police believed he was present when the killings occurred, and that he knew the location of the bodies. These comments indicate mere suspicion, and do not reflect that the police were in possession of concrete, inculpatory evidence that connected Pitts to the disappearance of the

- 39 -

victims (other than the fact that he pawned items belonging to one of the victims and had been a passenger in a vehicle involved in a police chase, but he provided innocent explanations for this conduct). Here, however, Detective Arey told McAdams there was "tons" of DNA and blood evidence at his two residences, and that the evidence was "really, really strong." Further, Arey created an atmosphere of inevitability when he told McAdams that he would not be allowed a couple of days to think about the situation because "everything's already set in motion" and expressed his belief that Lynda would not reappear because of "all that evidence." Under such circumstances, a reasonable person would believe "that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping." Id. Thus, the degree to which McAdams was confronted with tangible evidence that strongly suggested his guilt, rather than uncorroborated accusations and mere suspicion, distinguishes this matter from Pitts. Accordingly, our conclusion that McAdams was subjected to custodial interrogation and, therefore, should have been read the Miranda warnings prior to his confession is not altered by the decision of the Second District.

**Harmless Error**

Statements admitted during trial in violation of <u>Miranda</u> are subject to a harmless error analysis. <u>Caso v. State</u>, 524 So. 2d 422, 425 (Fla. 1988). In <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1135 (Fla. 1986), we explained:

> The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.

(Citation omitted.) Here, compelling evidence of McAdams's guilt was presented to the jury through his confession, in which he admitted that after being berated by his estranged wife and her new boyfriend at the Palomino Lake Drive residence, he became outraged, retrieved a gun from outside the residence, fatally shot them, buried the bodies in a rural area, and disposed of the weapon. It is simply impossible to conclude that the erroneous admission of this highly detailed confession did not contribute to the convictions in this matter. <u>Id.</u> Accordingly, we hold that the <u>Miranda</u> violation constituted harmful error.[13]

---

13. Further, although McAdams continued to speak with the detectives after the <u>Miranda</u> warnings were given, he was not informed about the attorney at the sheriff's office until <u>after he directed the detectives to the bodies</u>. As previously discussed, this conduct violated the Due Process Clause of the Florida

## CONCLUSION

More than twenty years ago, we stated with regard to the Declaration of Rights in the Florida Constitution:

> Special vigilance is required where the fundamental rights of Florida citizens suspected of wrongdoing are concerned, for here society has a strong natural inclination to relinquish incrementally the hard-won and stoutly defended freedoms enumerated in our Declaration in its effort to preserve public order. Each law-abiding member of society is inclined to strike out at crime reflexively by constricting the constitutional rights of all citizens in order to limit those of the suspect—each is inclined to give up a degree of his or her own protection from government intrusion in order to permit greater intrusion into the life of the suspect. The framers of our Constitution, however, deliberately rejected the short-term solution in favor of a fairer, more structured system of criminal justice:
>
> > These rights [enumerated in the Declaration of Rights] curtail and restrain the power of the State. . . . Under our system of constitutional government, the State should not set the example of violating fundamental rights guaranteed by the Constitution to all citizens in order to obtain a conviction.

Traylor, 596 So. 2d at 963-64 (quoting Bizzell v. State, 71 So. 2d 735, 738 (Fla. 1954)) (some alterations in original). The sentiments expressed in Traylor remain equally important today, and this case demonstrates why constitutional safeguards must be jealously guarded to prevent overreaching by law enforcement in the quest to obtain a confession.

---

Constitution. Accordingly, the post-Miranda confession was similarly invalid and suppression of that confession, as well as all evidence derived from that confession, was required under the Florida Constitution.

In response to the rephrased certified question, we hold that when a person is questioned in a location that is not open to the public, and an attorney retained on his or her behalf appears at the location, the Due Process Clause of the Florida Constitution requires that law enforcement notify the person with regard to the presence and purpose of the attorney, regardless of whether he or she is in custody. The decision of the Second District Court of Appeal is quashed, and this matter is remanded for further proceedings consistent with this opinion.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I agree with the majority that the trial court reversibly erred by admitting McAdams' confession. Similar to the majority, I believe that McAdams was in custody before he confessed based upon the fact that he was informed, in response to a direct question after being confronted with incriminating evidence, that it was uncertain whether he could leave the sheriff's office. See Ramirez v. State, 739 So. 2d 568, 573 (Fla. 1999) ("A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest."). Therefore, because McAdams was in

custody and officers failed to advise him of his Miranda rights, the trial court should have suppressed McAdams' confession.

Once McAdams was in custody, this Court's decision in Haliburton v. State, 514 So. 2d 1088 (Fla. 1987) (Haliburton II), required law enforcement to notify McAdams that his family had retained counsel for him and that this counsel would like to speak with him. In Haliburton II, this Court adopted a dissent regarding the right to due process under the United States Constitution to create a broader right to due process under the Florida Constitution. Specifically, quoting Justice Stevens' dissent in Moran v. Burbine, 475 U.S. 412 (1986), this Court in Haliburton II held that the failure to inform Haliburton of privately retained counsel after he was in custody and Mirandized was "[p]olice interference in the attorney-client relationship [and] the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause prohibits." Haliburton II, 514 So. 2d at 1090 (quoting Burbine, 475 U.S. at 467 (Stevens, J., dissenting)). Accordingly, pursuant to Haliburton II, any evidence collected between the time McAdams was in custody and when law enforcement informed him of the attorney should have been suppressed as a violation of Florida's due process clause.

However, I disagree with the majority's extension of our decision in Haliburton II to voluntary interactions with law enforcement. As the Second

District cogently explained, "[n]either Haliburton nor any other case [cited] holds that it is misconduct for law enforcement officers to refuse to interrupt a noncustodial interview to permit an attorney access to a suspect who has voluntarily agreed to be interviewed." McAdams v. State, 137 So. 3d 401, 407 (Fla. 2d DCA 2014). In fact, cases in which Florida district courts have held that due process violations occurred pursuant to Haliburton II involved custodial interrogations, not voluntary interviews. See Bruce v. State, 92 So. 3d 902 (Fla. 4th DCA 2012); State v. Allen, 548 So. 2d 762 (Fla. 1st DCA 1989). Furthermore, the conclusion that Haliburton II only applies while a suspect is in custody is supported by and entirely consistent with this Court's precedent that protections for the right against self-incrimination under the Florida Constitution only apply in custodial settings. See Traylor v. State, 596 So. 2d 957, 966 (Fla. 1992) (holding that a suspect must be properly advised of his right to counsel in order to protect his right against self-incrimination under the Florida Constitution but explaining that "[t]hese guidelines apply only to statements obtained while in custody and through interrogation; they do not apply to volunteered statements initiated by the suspect or statements that are obtained in noncustodial settings or through means other than interrogation") (footnotes omitted); see also Roman v. State, 475 So. 2d 1228, 1233 (Fla. 1985) (concluding that "police officers questioning a suspect in a noncustodial setting [were not required to] comply with an attorney's request that

they cease questioning the suspect and then inform the suspect of the attorney's call") (emphasis added).

To be clear, the defendant in Haliburton II (like the defendant in this case) was in custody when privately retained counsel informed law enforcement of counsel's presence and purpose. See Haliburton v. State, 476 So. 2d 192, 193 (Fla. 1985) (Haliburton I). And because both Haliburton and McAdams were in custody, it is unnecessary and inappropriate for this Court to address whether Haliburton II should apply to non-custodial interviews.

The only reason given by the majority for extending Haliburton II to voluntary interactions in a case about evidence collected while the defendant was in custody is the majority's desire to "implement a bright-line rule" to avoid "determinations of when voluntary questioning evolves into custodial interrogation [that] will spawn hundreds of thousands of dollars in costs or expenses and hours in litigation." Majority op. at 16. However, the majority then goes on to determine the exact issue that it claims is too burdensome to litigate, namely that the defendant was in custody at the time the retained lawyer informed law enforcement of the desire to speak to the defendant. Moreover, the bright-line rule the majority adopts for pragmatic reasons is not justified because custody issues will still need to be decided pursuant to the United States Supreme Court's decision in Miranda and this Court's decision in Traylor. Specifically, in order to determine whether

- 46 -

incriminating statements made to law enforcement are admissible at trial, Florida courts will still need to decide whether a suspect was in custody and, if the suspect was in custody (even if that suspect was informed of retained counsel), whether any waiver of rights was voluntary, knowing, and intelligent.  See Ramirez, 739 So. 2d at 572-73 ("Both the United States and Florida Constitutions provide that persons shall not be 'compelled' to be witnesses against themselves in any criminal matter.  U.S. Const. amend. V; art. I, § 9, Fla. Const.  This constitutional guarantee 'is fully applicable during a period of custodial interrogation.'  Miranda v. Arizona, 384 U.S. 436, 460 - 61 [(1966)].").

Accordingly, I respectfully concur in part and dissent in part.

CANADY, J., concurs.

Two Cases:

Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance

Second District - Case No. 2D11-3158

(Pasco County)

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; John M. Klawikofsky, Bureau Chief, and Helene S. Parnes, Assistant Attorney General, Tampa, Florida,

for Petitioner/Cross-Respondent

Howard L. Dimmig, II, Public Defender, and William Larocque Sharwell, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

for Respondent/Cross-Petitioner